E-FILED
Friday, 21 October, 2005  09:46:07 AM
Clerk, U.S. District Court, ILCD

E X H I B I T

18

E-FILED
Friday, 21 October, 2005  09:46:07 AM
Clerk, U.S. District Court, ILCD

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

[TERE]SA SCHULTZE,            )
　　　　　　　　　　　　　　　　　)
　　　　Plaintiff,             ) No. 03 C 04089
　　　　　　　　　　　　　　　　　)
vs.                           )
　　　　　　　　　　　　　　　　　)
[GOOD]RICH EQUIPMENT CO.,     )
　　　　　　　　　　　　　　　　　)
　　　　Defendant.             )

COPY

DEPOSITION UPON ORAL EXAMINATION OF
TERESA M. SCHULTZE

Taken June 29, 2005
Commencing at approximately 11:15 a.m.

KATHLEEN CONNELL, CSR, RPR, RMR, RDR
Registered Professional, Merit and
Diplomate Reporter
(Certified in Iowa and Illinois)

CONNELL REPORTING
P.O. Box 3171
Rock Island, IL  61204-3171
(309) 788-3741

## Page 2

DEPOSITION

The following is the deposition of [TERE]SA M. SCHULTZE, taken pursuant to Notice of [Depo]sition, at the offices of Snyder, Park & [Nel]son, P.C., 1600 Fourth Avenue, Suite 200, [Rock] Island, Illinois, commencing at approximately [11:]15 a.m., on June 29, 2005.

APPEARANCES

Behalf of the Plaintiff:

ATTORNEY SUSAN BOGART
Law Offices of Susan Bogart
30 North LaSalle Street
Suite 2900
Chicago, IL  60602

Behalf of the Defendant:

ATTORNEY ROBERT T. PARK
Snyder, Park & Nelson, P.C.
1600 Fourth Avenue, Suite 200
P.O. Box 3700
Rock Island, IL  61204-3700

ATTORNEY MARK CHURCHILL
Churchill & Churchill, P.C.
1610 Fifth Avenue
Moline, IL  61265

[ALSO] PRESENT:  Roger Goodrich

[SPE]CIAL INSTRUCTIONS:  The deponent will review and
                        sign Attorney Bogart's
                        transcript copy.

## Page 3

　　　　　　　I N D E X

WITNESS                                        PAGE

TERESA M. SCHULTZE

　(Attorney Park)                                5


　　　　　　　E X H I B I T S

Schultze Exhibit Nos. 1 through 3 . . . . .    5

Schultze Exhibit No. 4 . . . . . . . . . . .  76

Schultze Exhibit Nos. 5 and 6 . . . . . . .  120


　　　　(Schultze Exhibit Nos. 1 and 3 through 6
retained by Reporter.  Originals included with
original transcript with copies to Counsel.
Original of Schultze Exhibit No. 2 retained by
Attorney Park.)


Certificate of Shorthand Reporter . . . . .  184

## Page 4

　　　　　　　S T I P U L A T I O N

　　　　It is stipulated by and between the parties
herein by their respective counsel that the
deposition of TERESA M. SCHULTZE may be taken
pursuant to the applicable Federal Rules of Civil
Procedure and Supreme Court and that notice of
taking said deposition is hereby waived.

　　　　That the deposition shall be taken before
Kathleen Connell, Certified Shorthand Reporter,
Rock Island, Illinois, at the approximate hour of
11:15 a.m., on June 29, 2005, at the offices of
Snyder, Park & Nelson, P.C., 1600 Fourth Avenue,
Suite 200, Rock Island, Illinois, and that the
testimony of the witness may be transcribed by
Kathleen Connell, Certified Shorthand Reporter, or
at her direction.

　　　　That in the event said transcript or any
portion thereof shall be sought to be used at time
of trial for any proper purpose under the Federal
Rules of Civil Procedure and Rules of the Supreme
Court, it shall not be necessary to call the
reporter to verify the accuracy of said transcript,
provided, however, respective counsel shall have
reasonable time from the date of delivery of the
transcript to call to the attention of the reporter
any errors or omissions.

EXHIBIT
18

### Page 9

in Hillsdale?
A. Myself, my husband, and our two children.
Q. How old are they?
A. Currently 11 and 13.
Q. Do you have a current either CV or resume that you use when you've applied for jobs?
A. I'm sorry. What do you mean, CV?
Q. A curriculum vitae or resume, job history.
A. I utilize a resume.
Q. Okay. So you would have copies of that available.
I don't mean today, but I mean generally.
A. Yeah, depending on when I apply for a job, they may just ask particular questions. I mean, I can certainly -- I don't have a standing one, but I can put one together.
Q. Oh, okay. So you don't have a standing one.
A. Not a standing one, no, if...
Q. Okay. Let me just go into your background a little bit.
Where did you go to high school?
A. DeWitt.

### Page 10

Q. Is it DeWitt High School in DeWitt, Iowa, or --
A. I think it's currently called DeWitt Central Community.
Q. And did you graduate?
A. Yes.
Q. What year?
A. 1980.
Q. Did you go on for further education after that?
A. Yes, I did.
Q. And I see here something -- did you go to Black Hawk College?
A. Yes, I have attended Black Hawk College.
Q. Okay. Where did you go after -- did you go someplace directly after high school?
A. No.
Q. Okay. What was the first -- was Black Hawk the first college you attended?
A. Yes, I believe so.
Q. How long did you attend Black Hawk College?
A. Could you clarify that for me? I mean --
Q. How many years did you attend Black Hawk College?

### Page 11

1  A. Total? Let's see. I attended Black Hawk
2  from 1985 to 1989 in conjunction with my
3  apprenticeship, and since that time I've taken
4  courses off and on. So four plus years.
5  Q. Did you receive a -- have you ever
6  received a degree of some type from Black Hawk
7  College?
8  A. I received a certificate after completing
9  my pipe fitter apprenticeship through the
10 Department of Defense which is a technical
11 curriculum and has a GPA -- which I have a GPA of
12 4.0 out of 4.0.
13 Q. And that was -- you attended during your
14 pipe fitter apprenticeship from 1985 to 1989?
15 A. Correct.
16 Q. Did you also attend Western Illinois
17 University?
18 A. Yes.
19 Q. And what years did you attend that?
20 A. I believe it was -- I can't tell you
21 specifically what years, but it was through 2002, I
22 believe.
23 Q. Did you receive a degree at that time?
24 A. Yes, I did.
25 Q. And what was your degree?

### Page 12

1  A. In engineering.
2  Q. Any particular type of engineering?
3  A. Manufacturing, with emphasis on process.
4  Minor was in management. I graduated
5  cum laude.
6  Q. Okay. And any other college that you've
7  had since your graduation at Western?
8  A. Yes, I've taken a couple classes through
9  Black Hawk since then.
10 Q. In what subjects?
11 A. Science classes.
12 Q. General science or anything specific?
13 A. Nothing specific.
14 Q. Okay.
15    MR. CHURCHILL: Just for
16 clarification, was it Western in Macomb or Western
17 here in the Quad-Cities out there -
18    THE WITNESS: Actually, I believe I
19 attended both. Some of them were not available
20 through the satellite campus here in Moline and
21 some certification training in Macomb.
22    MR. CHURCHILL: Okay.
23 Q. (Continuing) Are you currently enrolled
24 in any classes?
25 A. Yes, I am.

Page 17

Q. (Continuing) You said you worked as a pipe fitter for the Department of the Army for about ten years after you completed your apprenticeship.

Is that -- is my understanding correct about that?

A. In the neighborhood. It could have been longer than that.

Q. Okay.

A. I'll always be a pipe fitter.

Q. Okay. Did you have some other job with the Department of the Army other than pipe fitter?

A. Yes.

Q. And what was your next job?

A. Actually, during that time, I was detailed to one of several positions within -- I can't remember what they called it -- within the area that I worked on the Arsenal.

Q. Okay. Within the Department of the Army, was there a particular division or office that you worked through?

A. Yes.

MS. BOGART: Objection to the lack of time.

You mean throughout the entire time?

Page 18

MR. PARK: Right.

Q. Was it the same one, or did you switch around from one office to another?

A. It was renamed numerous times at the time I was there.

Q. Okay. What sort of reassignments -- or, special assignments did you have during that ten years after your apprenticeship was completed?

A. I was tasked with several challenges and opportunities including project manager over moving the manufacturing processes to a new manufacturing technology center that was constructed on the Island as well as detailed as a -- I believe it was called equipment specialist to develop preventive and predictive maintenance programs, substituted for my estimator planner in the plumbing and pipe fitting area, detailed as a supervisor manager for a time.

Q. What did you supervise and manage?

A. Skilled and nonskilled laborers.

Q. Doing pipe fitting work or some other type of work?

A. All types of work: skilled, nonskilled, government employees, contractor employees, different agencies within the installation,

Page 19

correspondence, planning, organizing.

Q. Any other special assignments?

A. I participated in a graduate school program through USDA that was approximately a one-year program.

Q. The Department of Agriculture?

A. Yes, in Washington, D.C.

Q. Okay.

A. It was an executive leadership program.

Q. Did you actually live in Washington during that time?

A. No.

Q. Okay. How did -- what did you do?

What did you actually do if you were participating in a graduate school program in executive leadership?

A. It's a one-year program through graduate school USDA where I actually worked with the John Deere Construction Group.

Q. Was that on the Arsenal?

A. No. I worked with the construction group as a government employee.

Q. Where did you do that work? I'm sorry.

MS. BOGART: Physically where was it located?

Page 20

MR. PARK: Yeah.

Q. (Continuing) Where were you?

A. The construction offices, downtown Moline.

Q. All right. John Deere Construction Group is a division of Deere & Company then?

A. Yes.

Q. Okay. And that was all during your one-year graduate school program?

A. Yes.

Q. Okay. After you finished this ten years that you've told us about, some of your different assignments, did you do something else for the Department of the Army before you left?

A. Yes. I was affected by a reduction in force and put in a position -- I don't recall exactly the title. It changed numerous times.

I think initially it was peripheral equipment operator. It ended up to be -- I think supply was in there and ended up in transportation.

Q. When you say a peripheral equipment operator -- I realize these are government terms.

Could you tell me what a peripheral equipment operator -- what that means?

A. I wish I could. Actually, in the shuffle

Page 21

of the paperwork and as people were affected, it changed numerous times in a short amount of time, and I never actually served that position.

Q. Okay. Do you know what peripheral equipment is?

A. Yes, peripheral equipment associated with computer processes, and whatnot. I can give you a for instance.

Q. That would be great.

A. If you have a main office setup, you have employees at peripheral stations. It surrounds the main central component.

Q. I see.

A. So it may include collators, decollators, printers, faxes, just a number of different types of equipment.

Q. So they are peripheral to a main computer?

A. Or process or department or however it may be utilized.

Q. Okay. Then you said you went into transportation?

A. Yes.

Q. And what did you do in transportation?

A. I was a transportation clerk.

Page 22

Q. You originally told me you worked for the Department of the Army until the year 2000.

Tell me how you happened to leave the Department of the Army.

Did you retire or --

A. No, I was let go.

Q. Was there a particular reason?

A. Well, I was transitioned out of my pipe fitter position because I was a nonvet and shuffled through many positions and ultimately let go.

Q. Was it because they were performing a reduction in force?

A. No, it's actually under litigation.

Q. Okay. So you have a claim against the Department of the Army because of your termination there?

A. Yes.

Q. Could you just tell me -- without going into specifics, could you tell me the nature of the claim?

MS. BOGART: Well, one claim's been decided in her favor which was that the -- her boss retaliated against her.

MR. PARK: For?

Page 23

MS. BOGART: Engaged in discrimination based on sex and retaliated.

MR. PARK: Because she complained.

MS. BOGART: Yeah.

MR. PARK: You say that case has been decided.

MS. BOGART: That was decided in her favor, and the Army did not appeal that.

MR. PARK: Is there another claim made?

MS. BOGART: There was another claim that was decided against her, and on appeal it was concluded that they did discriminate against her, but for business reasons it was okay to let her go.

MR. PARK: Okay.

MS. BOGART: But that was also a sex discrimination claim. Yeah, it was a hostile work environment.

It's actually one individual who engaged in all that activity and one of his cohorts.

Q. (Continuing) During the time that you were with the Department of the Army, did you do any work that had to do with the repair of farm machinery?

Page 24

A. Farm machinery -- could you clarify that, be more specific? What type or --

Q. Well, planting, harvesting, cultivating.

A. I'm not clear exactly on what you're asking.

Q. Okay. I guess I'm not sure what I'm not being clear about.

Do you understand what I mean by farm machinery?

A. Well, I'm not sure if you're talking specifically about tractors, equipment, engines, systems, processes related to -- maybe if you could clarify.

Q. Let me try again. I'm not talking about the manufacture of equipment. Okay?

I'm talking about the repair of any type of farm equipment.

Was that part of your job while you were with the Department of the Army?

A. I'm going to say no, if I understand you correctly.

Q. Okay. Did you have any positions where you supervised the repair of farm equipment?

A. It depends on what you consider farm equipment.

Page 25

Q. Okay. If we give it a broad definition, does that --
A. I would say potentially yes.
Q. Okay. Tell me about that.
A. We utilized mechanical equipment that is utilized in agricultural situations, for instance, forklifts, roads and grounds equipment, so...
Q. And what did you have to do with forklifts, roads and grounds equipment?
A. At one point, I supervised people that operated and repaired those, and myself as a pipe fitter installed, maintained, replaced systems such as air conditioning, water, gas, high pressure, drainage associated with that aspect, hydraulics, pneumatics, electrical, and electronic equipment.
Q. So you actually did the repairs yourself on forklifts, road and ground equipment, and so forth?
A. We assisted at times, yes, and installed, as I mentioned, maintained, repaired, and replaced systems related to that.
Q. Okay. And for what period of time did you do that work?
A. I would say off and on throughout that

Page 26

entire time.
Q. For 20 years?
A. Yes. Almost, yeah.
Q. After you left the Department of the Army, where did you go?
What was your next employment?
A. I believe that would have been John Deere.
Q. When did you go to work for John Deere?
A. I believe it was May of 2001.
Q. And where was that?
A. Horicon, Wisconsin.
Q. Was all your work for Deere & Company at Horicon, Wisconsin?
MS. BOGART: With the exception of what she already described with the USDA?
MR. PARK: Right.
Q. (Continuing) I'm sorry. After you left the Department of the Army, was your employment with John Deere only at John Deere, Horicon, Wisconsin, or did you work at any other plants?
A. No, just at Horicon, I believe.
Q. When you began at John Deere in May 2001 at Horicon, what was your job?
A. I was technical services supervisor or

Page 27

manager, I don't remember the exact title.
Q. And what did you actually do?
A. I was responsible for the skilled and nonskilled labor force on second shift.
Q. What did the labor force -- did they manufacture farm equipment?
A. No.
Q. Some other kind of equipment?
A. Yes.
Q. What kind?
A. Commercial and consumer equipment.
Q. Could you give me some examples?
A. Lawn and garden tractors.
Q. And how long were you a technical service supervisor?
A. Approximately one year.
Q. What would you actually do to supervise the labor force?
A. Could you be more specific?
Q. Okay. What --
MS. BOGART: Carry a big stick.
Q. (Continuing) What did you -- how did you actually supervise the force, in other words?
A. I was responsible for the financial aspect of the department, the employee supervision,

Page 28

the organization within internal and external departments, jobsites, specific projects, budget, employee appraisal, employee development, training, apprentice programs, scheduling, project management, a multitude of different aspects.
Q. Okay. And you said you kept that position for about one year?
A. Correct.
Q. And did you have another position, or did you leave Horicon?
A. I left Horicon.
Q. And tell me about how you happened to leave Horicon.
A. I resigned for personal and family reasons upon the diagnosis of my mother having cancer and being away from my family.
Q. Did your employment at Horicon require you to live other than at your address in Hillsdale?
A. Yes.
Q. Where did you live for that period of time?
A. In Horicon.
Q. Okay. So while you told me you lived in Hillsdale for 15 or 16 years, you were also living

**Page 37**

A. I believe that was still in October.

Q. To the best of your recollection, tell me what that phone conversation was.

A. Roger explained to me that they had discussed with the gentleman that was currently in the position that it was not working out to the best for both sides, being that individual and the dealership, and he was able to re-secure the position, as I understand it, that he held previously in coming to Goodrich and basically went back to his old position, and they extended me an offer to accept the service manager position.

Q. Was there any discussion at that time regarding pay?

A. Yes. As a matter of fact, I went back and met with them because I had some concerns with school and home situations, and they wanted me to start immediately.

And we negotiated me to start part-time for the month of November and then full-time in December, and that given the transition period, my pay would be equal to that of Klint Rice's, which was the previous service manager position, after 60 days.

That would allow time for some of the

**Page 38**

decisions that Klint had made to filter through the system and basically not have any impact on the way I was running the business.

Q. When you started part-time, what was your understanding as to what your pay would be?

A. At that time, the initial offer was for -- I believe it was 35,000 a year.

Q. While you were working part-time, were you still going to be on a $35,000-a-year salary?

A. Yes, until I became full-time.

Q. And then once you became full-time, what was your salary to be?

A. It was supposed to be 42,000.

Q. Was there any period of time where you were paid by the hour as opposed to salaried?

A. Not that I'm aware of.

Q. You said something about 60 days. You were going to start part-time in November, and then after 60 days there was something that was going to happen.

A. No, I would work part-time for the month of November getting familiar with what Klint did in the office and the processes involved, how they flowed the work through, how the shops basically functioned within the dealership.

**Page 39**

1  I had a commitment personally and with
2  school at the time and then had committed to going
3  full-time the month of December.
4     Q. So what was the 60 -- after 60 days, what
5  was supposed to happen? 60 days from when?
6     A. My pay was to be increased comparable to
7  that of what Klint was receiving as a service
8  manager.
9     Q. What was your understanding as to his pay
10 as a service manager?
11    A. It was approximately 42,000 annually.
12    Q. And you were supposed to get this
13 beginning 60 days after the day you started or 60
14 days after the time you became full-time, or do you
15 recall?
16    A. I don't recall specifically.
17    Q. Any other aspects of your employment that
18 you recall --
19       MR. PARK: Strike that.
20    Q. (Continuing) You said that after you had
21 spoken with Roger Goodrich on the phone about the
22 opening, that you went back and met with them --
23 and I guess them would be Roger and Klint.
24    A. Yes.
25    Q. And are we still in October?

**Page 40**

1    A. Yes.
2    Q. Other than what you mentioned about being
3  part-time during November, full-time in December
4  and what you understood that your pay would be, any
5  other discussion with them at that time?
6    A. Yes. The first day that I started
7  part-time in November, Roger asked me to lunch and
8  we discussed vacation and asked me if we took
9  normal family vacations.
10      I wasn't sure what he considered normal,
11 and I said my husband's usually busy in spring and
12 fall, and he said -- that's the only thing he
13 asked, that during the busy seasons, spring for CP
14 and fall during harvest, that I not take off during
15 that time.
16      At that time, I shared with him that
17 wouldn't be a problem because that was also the
18 busy time of year for work for my husband with his
19 company where he was employed.
20    Q. What was your understanding as to what
21 the vacation policy was?
22    A. At that time, we discussed a couple weeks
23 in the fall and a couple weeks in the spring but
24 not during the busy season, so a total of four
25 weeks annually.

**Page 45**

Q. And that was never put in terms of depending on how you worked out or anything like that?

A. No. That was the whole aspect of me spending some part-time time with Klint in the service manager position to get a feel for what actually took place throughout the day in the life of a service manager.

Q. What were the hours of employment as service manager?

A. During what time? Can you be more specific?

Q. Well, when you went -- I understand you were part-time in November.

Let's say beginning in December when you say you went full-time.

In December of 2002, what were the full-time hours?

A. During -- depending on the time of the season, it was 7 or 7:30 a.m. until 4:30 or 5 p.m., and on Saturdays I believe it was 8 to noon or 7 to noon. It changed during the year.

Q. Depending on the busy season?

A. Yes.

Q. Okay. So during the busy season, was it

**Page 46**

from 7 to 5?

A. And longer sometimes.

Q. With regard to Saturday work, did you work every Saturday?

A. Not every Saturday.

Q. Did you switch off with somebody?

A. Yes, occasionally. I switched intermittently with Mike DeRew from the tractor shop, and in the off-season that gave each of us an opportunity to have a Saturday or -- occasionally.

Q. In the busy season, both you and Mike would work on Saturday morning?

A. Yes.

Q. Were your hours the same as the other people in the service shop?

MS. BOGART: Objection to form. Who is the other people?

MR. PARK: Okay. That's a good question.

I'll withdraw the question.

Q. (Continuing) During the time that you were service manager, what were -- can you describe what your responsibilities were?

A. As service manager?

Q. Yes.

**Page 47**

A. I was basically responsible for all aspects of the business related to service at the dealership including everything from scheduling work, consulting with the sales staff, the managers, resolving discrepancies with customers, with bills, with John Deere personnel, area managers, employee development, budget, monthly reports, billing, to some extent training.

I was also tasked, after a time, to communicate when we received new equipment, was tasked with starting a development of an OSHA awareness program with the employees, equipment files, inventory, warranty, parts -- used and new parts, pretty much all aspects of the business.

Q. Would you actually -- you said one of your jobs was scheduling work, correct?

A. Yes.

Q. Tell me what you would do to schedule work.

Would you actually set up appointments with the customers?

A. Yes.

Q. So if a customer called in, you would write down what the customer's appointment was?

A. It depends on the situation.

**Page 48**

Q. Sometimes?

A. Yes.

Q. Okay. Most of the time would you refer that call to either the ag shop or the consumer products shop?

MS. BOGART: Objection to form.

Most of the time what -- what call?

Q. (Continuing) A customer who was calling for service, would you normally refer the call?

The customer called and wanted to set up a service appointment.

Was the normal practice for you to schedule the appointment or for you to refer the call to the service department?

A. Well, I was in the service department.

Q. To the particular service shop depending on the type of equipment.

MS. BOGART: And I'm going to object to form because I don't know that we've established a normal practice at this point.

But go ahead.

A. I'm not sure if I understand your question correctly, but it depended on the nature of the call: if it was a question, if it was a bill, the time of year, the season, the type of

Page 53

MS. BOGART: Objection to form. Use of the term most.

A. Without knowing the exact number of complaints and being able to know exactly how many are related to cost, I would just say that there were a vast majority of reasons that people called.

Everything from maybe they didn't feel it was repaired or it broke again or delivery times, pickup times, cost of the repair, cost of parts, times during specials, tiered labor rates.

Maybe they were under the impression that they were going to get something -- we tried to do our best to resolve all of those questions up front, but, you know, ultimately the communication sometimes broke down and not all the information that needed to be shared was shared up front.

Q. What sort of things did you resolve with John Deere?

A. Warranty issues, special incentives.

Area managers from sales and service, parts would occasionally schedule times to stop at the dealership as part of their area of coverage. We would discuss upcoming incentives or programs

Page 54

Deere was going to come up with.

We resolved warranty items. We had to keep parts -- some of the parts needed to be returned to Deere for warranty issues, or on a specific series -- for example, a specific series of tractors may have a notorious problem, and Deere would occasionally request any parts that were replaced related to that problem be kept and sent in for review or to be analyzed.

Product improvement programs, known as PIPs, sales incentives -- there was a lot of communication from the business side with those people.

Q. What was your function as far as billing? Did you generate bills?

A. Could you clarify that or be a little more specific?

Or at what point -- or, what part did I play in the billing?

Q. Right. What part did you play in the billing process?

A. I usually reviewed the work orders that the technicians worked on specific to the equipment before the final bills were sent out.

Q. When a technician would work on the

Page 55

1  equipment, a work order would be completed by the
2  technician, correct?
3     A. Yes.
4     Q. Okay. The work order would be started by
5  you or by somebody else?
6     A. It could be me. It could be the service
7  scheduler which was Lori Hamer.
8        Occasionally some of the shop foremen
9  would come in and do their own work orders
10 generated for a customer on a piece of equipment.
11    Q. Once the work order was done and the work
12 order was then completed, then would it come back
13 to you next, or would it come back to Lori, or who
14 would it come back to?
15    A. Normally, once the work order -- work was
16 complete on the equipment, Lori would type up the
17 comments that the technician put on the work order,
18 and a preview would be generated for the technician
19 to review before it was finalized.
20    Q. Would Lori prepare the preview then?
21    A. The majority of the time, yes.
22    Q. And then the tech would take a look at
23 the preview?
24    A. Yes.
25    Q. And then would you also review the

Page 56

1  preview?
2     A. Not every one. Depending on the
3  situation.
4        We wanted to capture any comments that
5  were pertinent to warranty work or product
6  improvement programs, make sure that part numbers
7  were entered and all of the pertinent data was
8  captured in the history of that work order.
9        So not all of them, but if there were
10 problem ones or ones that needed attention for
11 whatever reason, they may be brought to my
12 attention.
13    Q. Okay. Who would bring them to your
14 attention?
15    A. It would be Lori. It could be the shop
16 foreman. It would be the technicians.
17       It depends again on the situation.
18    Q. What about -- you said something about
19 training.
20       Did you handle training?
21    A. Could you be more specific? What do you
22 mean?
23    Q. Well, when you were listing your
24 responsibilities, you mentioned training. I guess
25 I'm trying to find out why you mentioned training.

Page 57

Q. Did you train the service technicians, or did you arrange for them to go for training or --

A. Yes, I arranged for them to go to training through JDIS, some of them.

Pretty much on a regular basis I tried to check weekly, at least weekly, to find out what John Deere was offering and what technicians had historically attended for training and if they were -- or, if there was a need for them to get some updated training on any particular piece of equipment or type of equipment to keep their skill levels up to maintaining their ability to repair the equipment.

Q. Okay. You said that you developed an OSHA program or you were asked to develop an OSHA program.

A. Yes. Roger Goodrich asked me, after an employee was injured and filed a claim in the dealership with a lift table, that it was -- actually, I took it to Roger's attention.

It was an area of concern because some of the equipment was old, and there was no inspecting on the equipment, and it was a concern of mine initially.

And so after I brought it to his

Page 58

attention, he asked me to put some basic OSHA information together that would apply to the dealership and share it with the technicians.

Q. And did you do that?
A. Yes, I started to do that.
Q. What did you get done?
A. Well, as I recall, I had completed an OSHA certification course through Western Illinois University and had the basics and contacted the gentleman that taught that, explained the situation to him and gathered some information in a general nature specific to, for instance, electricity and safety involving running cords, tripping hazards, equipment -- establishing an equipment file of lift tables, hoists, inspect them, make sure they were in proper working order, identify any needed repairs on that equipment to help alleviate the possibility of anybody being injured or incurring an injury while in the line of duty.

Q. Okay. So you inspected equipment?
A. No, that's not what I said. I --
Q. Did you arrange for equipment to be inspected?
A. Can you be more specific?
Q. I'm just trying to find out -- you said

Page 59

you put together an equipment file.

A. I started to establish an equipment file of equipment that was utilized in the process of providing service at the dealership, for instance, lift tables, hoists, pneumatic and electric tools, jacks.

And initially, right off the get-go, some of the technicians brought several pieces to my attention that were not in proper working order that needed repair.

We identified some of the equipment. I told them not to use it if it was not in proper working condition.

So it was just sort of a ground-level awareness, education and getting the equipment up to a safe working condition.

Q. What did the -- you said equipment file.

Were you making a listing of what the equipment was?

A. Yes. For instance, like lift tables, ideally, in an equipment file we would identify lift tables, and if there were four of them, they would all have a number, either by serial number or table 1, 2, 3, 4, for example.

And we would keep track of any repairs

Page 60

done to those all in an effort to try to decide when it was financially responsible to replace that piece of equipment due to deterioration, wear, if it was obsolete, if there was something safer, you know, did it fit the needs, did the lift table have the capacity to lift the particular piece of equipment that the technician was working on.

For instance, we didn't want a 2,000-pound table lifting a 3,000-pound tractor. It wouldn't be -- it's not rated to do that, and it puts the employee and the dealership at risk and liable for an injury.

Q. Okay.
A. Some of them weren't even identified as to what the capacity was, so that was a serious concern of mine.

Q. What would you do in that situation?
A. Well, we would try to find a make and model and go back to the manufacturer and identify if, indeed, that's what it was and find out the rated capacity and then mark it, identify it as such.

Q. And did you do that with some equipment?
A. I don't recall specifically for any particular piece of equipment.