EXHIBIT 18A

### Page 65

A. Well, several. From the technical aspect, my mechanical background in being a pipe fitter came into play on several occasions when technicians were unable to locate or identify repair procedures, set-up procedures -- sometimes we would talk it over and decide what was a logical approach -- being knowledgeable on where to go for that information, either a tech library or the manufacturer or calling a subject matter expert maybe at a factory, all of which I did.

And additionally managing the resources, being physical resources and human resources, related directly to previous positions I held as a manager and as a technical repair person, being a pipe fitter.

Q. So you actually assisted the technicians with finding problems with equipment.

MS. BOGART: Finding problems?

A. Actually, I would say --

Q. Diagnosing or finding.

A. Diagnose problems -- oftentimes new equipment involved set-up procedures, repair packages, parts packages instead of one individual part.

A lot of that information was not always

### Page 66

readily available to the technicians, and instead of having them spend an hour trying to locate it, I would much rather have them busy doing repairs in the shop generating labor.

So I would either take it upon myself to locate that information or call a subject matter expert depending on the specific scenario.

Q. So you would help them locate the necessary information?

A. Sometimes, yes.

Q. Going back to your pay, you started out at part-time, but you received -- did you receive a full salary when you first started in November?

A. I'm not sure what you mean by full salary.

Q. Well, were you being paid $35,000?

A. My pay was based on a $35,000-a-year annual salary, but I only worked part-time for the month of November in 2002.

Q. So it was prorated?

A. Yes.

Q. And when you went full-time, then you moved up to $35,000?

A. No, it was still based on the $35,000-a-year annual pay for the -- what was

### Page 67

supposed to be an agreed-upon 60 days and then raised to the salary of that comparable price of Klint Rice who had been the previous service manager.

Q. When you started part-time, you didn't get the full salary because you weren't working full-time, correct?

A. I guess that would be correct.

Q. Okay.

A. It was based on the $35,000-a-year annual salary, if I understand your question correctly.

Q. Right. But it was prorated because you weren't working full-time hours.

A. Correct.

Q. All right. Once you started working full-time hours, were you paid $35,000 or equivalent monthly pay for a $35,000 annual salary?

A. Actually, the pay was every two weeks, I believe --

Q. But you --

A. -- not monthly.

Q. But your salary was $35,000 beginning in December of 2002?

A. Yes, and that was the base pay to establish my, as you call it, prorated pay for

### Page 68

November.

Q. Okay. Right. So you felt that you were starting at 35,000 even in November, but you weren't working full-time.

A. Correct.

Q. At some point in time, were you raised to $42,000?

A. No.

Q. Did you ever get any raises during the time you were at Goodrich?

A. Yes.

Q. When did you get a raise, and how much was your raise?

A. It was approximately the May 2003 time frame after a meeting between Roger Goodrich and myself and a conversation we had regarding a performance review.

Q. And when you received that raise, how much was it?

A. I believe it took me from 35 to roughly $37,000 a year, not the agreed upon 42,000.

Q. So at no time did you make $42,000?

A. Correct.

MR. PARK: Do you want to take a lunch break? We'll come back at 1:45.

Page 69

1    Off the record.
2    (Break from 12:49 to 2:07 p.m.)
3    MR. PARK: We're going back on the
4 record.
5    Q. I'd like to go back to the discussion
6 that you had with Mr. Goodrich when you discussed
7 the position and pay. Okay?
8    This would have been in October of 2002,
9 correct?
10   A. I believe so.
11   MS. BOGART: The conversation or the
12 time that she started working?
13   MR. PARK: No, when she had the
14 conversation with --
15   MS. BOGART: Okay.
16   Q. You had a conversation with Roger
17 Goodrich just shortly before you started work about
18 what the pay would be, correct?
19   A. Correct.
20   Q. And that would have been in October of
21 2002?
22   A. Right about that time, yes.
23   Q. Where was that conversation?
24   A. It would have been upstairs in what is
25 known as the conference room at the dealership.

Page 70

1    Q. And who was present at that time?
2    A. Roger Goodrich and myself.
3    Q. Okay. To your knowledge, did anyone else
4 overhear Mr. Goodrich promise you this $7,000 raise
5 after 60 days?
6    MS. BOGART: Objection to the form
7 of the question. I don't think that's how the
8 conversation went.
9    MR. CHURCHILL: That's how she
10 testified.
11   MS. BOGART: The effect of what she
12 testified to was there would be a raise of 7,000,
13 but I don't think that she testified that's the way
14 he communicated it.
15   So I think you're mischaracterizing
16 the communication. So I object to the question.
17   Q. (Continuing) If you can answer, go
18 ahead. Otherwise I'll rephrase it.
19   A. I'll answer to the best of my ability.
20   When the job offer was made and the
21 salary was clarified, at my request -- I asked him
22 to clarify, is that the initial salary for the
23 part-time, you know, to clarify what would the
24 full-time pay be, or whatever.
25   As I mentioned earlier, that was in the

Page 71

1 second discussion we had with regards to the
2 position.
3    In the meantime, I had spoken briefly
4 with Klint Rice and clarified, you know, what pay
5 is comparable for the position.
6    I had also done some research for service
7 managers around the general area to find out what
8 the average pay was, and his initial offer of
9 35,000 did not come close to what the average pay
10 was and what Klint had suggested that I -- I think
11 his words were to hold out for.
12   And so in our discussion, I made it clear
13 that I was not able to commit to full-time to begin
14 with, but we thought with a part-time basis for the
15 month of November it gave Goodrich Equipment and
16 myself an opportunity to really decide if this
17 was a good fit or something that I wanted to
18 continue doing for, you know, an extended period of
19 time.
20   And after -- if it was decided that I
21 would continue, then I would be bumped up to the
22 higher salary.
23   Q. When you talked with Klint Rice, did he
24 indicate what he was making?
25   A. He didn't specifically say his exact

Page 72

1 salary, but he said comparable, I would hold out
2 for 42.
3    And I believe as the records show, his
4 salary that year was just slightly over 42,000.
5    Q. Was there any discussion as to what the
6 employee who was service manager that didn't work
7 out -- how much that employee was paid?
8    A. Not that I recall. I don't even recall
9 his name right now.
10   Q. Okay. What research did you do to find
11 out what service managers were paid?
12   A. I believe I had looked on a salary
13 website for the local area -- and I don't recall if
14 it was according to zip codes or states or
15 cities -- for service-related managerial positions
16 in that particular market.
17   Q. Did you call any other farm equipment
18 dealerships or check with any other farm equipment
19 dealerships in the Henry County or the surrounding
20 areas?
21   A. I don't recall Henry County, but I do
22 recall talking to a couple of dealerships in the
23 Quad-City area, and there may have been one or two
24 other ones in outlying rural -- more rural setting
25 areas, not metropolitan areas.

Page 73

Q. You don't recall what website you would have looked at?

A. No, but I do remember it was specific to the local area in that particular service field.

Q. Okay. Was there ever any documentation with regard to what your pay was going to be or that you would be receiving a raise?

A. Could you repeat that again?

Q. Was there ever any documentation of what your pay was going to be to start or that you would receive a raise?

A. No, I don't believe so.

Q. While you were at Goodrich, did you ever receive any written performance appraisals?

A. Yes.

Q. Okay. Tell me how -- what those looked like.

A. Well, periodically I would speak with Roger, given the opportunity when he was available, and ask him, you know, what did he feel was going well, get his feedback, if there were any areas of improvement.

In May, I believe, on May 6th of 2003, we had met either the day before or that particular day, and he sent me an e-mail, sort of a conclusion

Page 74

or a summary on our discussion highlighting, you know -- I believe his words were my high-level review of the position, some things I wanted to do, some new things that I thought would be beneficial, you know, what was going well, were we meeting the goals and objectives -- the financial goals and objectives of the service department.

And to the best of my recollection, I believe every month we were on target. There may have been one month we were slightly short, but it was pretty consistent with the goals: advertising, marketing specials, trying to streamline the business, eradicate any redundancy in duplicating effort and time and resources within the business.

So it was a pretty -- fairly in-depth discussion.

MR. PARK: Would you read back my question, please.

(Requested information read.)

Q. I guess I thought I had asked you if you had ever gotten any written performance appraisals, and you told me about a meeting or some meetings you had with Mr. Goodrich.

MS. BOGART: And a written performance, summary --

Page 75

1  A. And an e-mail reply on the 6th.
2  Q. So May 6, 2003, was an e-mail to you?
3  A. Yes, that was after our meeting regarding
4  our performance review.
5  Q. I see.
6  A. I had requested on a fairly regular basis
7  to get his feedback.
8     Because certainly the 60 days had passed
9  since I was promised the pay increase and was put
10 off a number of times and was requesting to meet
11 with him to get a review because I was not aware of
12 anything that was not successful at that point.
13 Q. So when you met with Mr. Goodrich, all of
14 the feedback was positive?
15 A. Yeah, we covered a majority of aspects of
16 the business.
17    The financial goals were in line.
18    We had addressed training issues and done
19 some projections on the training budget, what would
20 be spent per employee, what the goals were by month
21 for the service department.
22    That would be combined between the CP
23 shop, the tractor shop, and the ag shop.
24    Nothing short was brought to my attention
25 at that time.

Page 76

1      MS. BOGART: Can I see that? I
2  think that's the only copy.
3      MR. CHURCHILL: It is the only copy.
4      MR. PARK: Okay. That's --
5      MS. BOGART: It's Bates stamped
6  00092, the e-mail.
7      MR. PARK: Okay. I don't know if
8  we --
9      MS. BOGART: I didn't get a copy of
10 the stuff we gave you today, so I didn't --
11     MR. PARK: Maybe we can have that
12 marked.
13     MS. BOGART: No, this we just
14 provided today.
15     MR. PARK: Oh, okay. Let's mark
16 this then.
17     MS. BOGART: And then we'll get a
18 copy because we don't have an extra copy.
19     MR. PARK: Right.
20     (Schultze No. 4 marked for
21 identification.)
22 Q. I'm showing you now what's marked as
23 Schultze Deposition Exhibit 4, I believe it is.
24    Is that correct?
25     MS. BOGART: Mm-mmh.

Page 77

A. Mm-mmh.

Q. Is that the e-mail you just told me about a few minutes ago?

A. Yes.

Q. All right. Now, you had gotten other e-mails from Mr. Goodrich during the course of your employment, right?

A. Yes.

Q. And in your response to request for production you had produced some other documents that you felt were responsive to what e-mails you had.

I'm going to show you Schultze Exhibit No. 1.

MS. BOGART: This is responsive to the question of performance.

MR. PARK: Right.

Q. (Continuing) My recollection was that we asked you to produce whatever documents you had and that you produced these 17 pages of e-mails.

MS. BOGART: So is the question: Did she produce these 17 e-mails?

Or is the question: Do these pertain to her performance?

THE WITNESS: He directed me to

Page 78

these. I wasn't asked a question yet.

MR. PARK: Yes, I didn't know that I asked a question.

MS. BOGART: Yeah.

Q. (Continuing) My question is: Those e-mails that you produced previously, those relate to your performance; is that correct?

A. Yes. If they're the ones -- and I'm assuming that they are -- then, yes, it appears that they are.

Q. Okay. And how is it that you didn't have the other e-mail that you just produced today?

Is it just that you overlooked it or --

MS. BOGART: Schultze 4.

Q. (Continuing) Schultze 4.

A. I may have overlooked it, or it may have been in documents that were provided to us. I'm not sure.

Q. Okay. Did you have any meetings with Roger Goodrich after you began work where you discussed salary with him before May 6th, 2003?

A. Yes.

Q. All right. On how many occasions?

A. Several. As I mentioned, I recall the meeting before I started employment with Goodrich.

Page 79

1  I recall discussing it briefly the first
2  day of my part-time employment with -- when
3  Goodrich asked me to lunch when we went locally
4  there where we also discussed vacation and after
5  the 60-day time frame, which would have been
6  approximately January, and periodically thereafter.
7     Q. Why don't we talk about January, then,
8  the first time you discussed it with him after you
9  had been there 60 days.
10    Is that -- was that in January?
11    A. Yeah -- well, the end of January would
12  have been the end of 60 days of full-time
13  employment.
14    And I had approached Mr. Goodrich and
15  asked him, you know, for feedback on how he felt I
16  was doing as a service manager, any areas --
17  specific areas that needed to be addressed,
18  feedback.
19    So my thought was if there was something
20  wrong, I needed to be made aware of it. Nothing
21  was brought to my attention.
22    Several other times after that, when the
23  discussion was brought up, it may have been an
24  inconvenient time for him or he was going to be
25  gone or he said he would look into it, but nothing

Page 80

1  transpired from that point on.
2     Q. The first time you spoke to him about the
3  salary question in January, this is the first time
4  that you made some complaint or had some question
5  about why you weren't getting paid more?
6     A. My question at the time was to get his
7  feedback on how I was doing in the position of
8  service manager.
9     I wanted to make sure I was covering all
10 the bases and adequately performing the duties and
11 responsibilities of the position.
12    I didn't receive any negative feedback.
13 That was in lieu of anticipating the pay raise.
14    When it didn't happen after 60 days, I
15 did bring it to his attention. You know, I was
16 under the understanding, according to our
17 discussion, that after 60 days -- his reasoning at
18 the time or his explanation to me at the time was
19 60 days would allow enough time for business
20 transactions to process through the system after
21 Klint Rice left the position, and there would
22 basically be no carryover from Klint. It would all
23 be a direct result of my managing the service
24 aspect of the business.
25    Q. So you asked him why you weren't being

Page 81

paid more?
A. Why I had not received the raise I had been promised.
Q. And what was his response?
A. At that time, he said he'd have to look at, you know, the monthly budgets, what the service department had done.
Generally speaking, he implied that he would look into it and we would discuss it, but there was no specific date and time set initially.
Q. Okay.
A. I did pursue it thereafter, though.
Q. What were your discussions in your later -- what were your later discussions with him where you pursued it further?
A. The later discussions included, again, soliciting feedback. I thought maybe there was a reason -- a viable reason why I hadn't received the promised pay raise. I thought I deserved an explanation.
There were a couple times I think I was put off. It wasn't convenient. He would look into it. He thought maybe there were a few things hanging out there that still stemmed from decisions Klint had made.

Page 82

However, in the meantime, I felt that I was aggressively cleaning up -- pursued cleaning up a lot of old business that had lived there, work orders that were several years old, warranty issues that were a couple of years old, kept Mr. Goodrich abreast of each and every situation.
As a matter of fact, I think there were documents supplied that verified warranty information, and he said something to the effect of good job. Keep on them. Get every penny we're due.
There were old -- there was an old work order specifically for, I believe it was, Kinze or one of the other suppliers in Iowa where I was able to recoup some money from them that was, as I recall, a couple years old.
I really worked on the work order backlog, cleaning up old business that had been hanging out there for a very long time.
I thought we made tremendous strides and tremendous progress in the service department in not only handling the day-to-day business but some of the things that had been looming out there, getting customer complaints, warranty issues with the dealership with John Deere resolved, calling in

Page 83

1 the area managers.
2    And I was not aware of any particular
3 instance or issue that I had fallen short of.
4    Q. And his feedback -- or, his comments to
5 your questions about pay were simply that he would
6 look into it or he would talk to you about it
7 later?
8    A. Yeah, I think -- I feel that -- in
9 retrospect, that I was put off for several months
10 until I really made a sincere effort to pin him
11 down and say, you know, is there something I'm not
12 doing? You know, do I get a review, a quarterly
13 review? I need to have something to compare it to
14 or some reason explained to me, you know, what's
15 holding you up.
16    And eventually, as I recall, it
17 transpired where when I did pin him down, we did
18 the review and we discussed the pay increase.
19    As he had promised, it did not end up to
20 be the 42,000. It ended up to be in the
21 neighborhood of 37,000. It was -- I don't remember
22 the exact amounts. It wasn't even an even dollar
23 as it would calculate out to be prorated. So it
24 was a very, very small incremental raise.
25    And I think I even had to send an e-mail

Page 84

1 to him saying, well, fine, I'll let Bill know, Bill
2 Schneider in the office, to anticipate this, and it
3 took a little prodding, I guess, to get him -- and
4 I was under the impression at that point that it
5 would be the full promised pay increase to the
6 42,000 salary that we had discussed prior to my
7 employment.
8    Q. Okay. At some point, did you send Roger
9 an e-mail about this?
10    A. Yes.
11    Q. Okay. Showing you Roger Goodrich
12 Exhibit No. 6, is that the e-mail that you sent?
13    A. Yes, on June 2nd, 2003, where I did refer
14 to the 42,000 level we had discussed and had
15 discussed several times over the preceding months
16 and had also put a copy of the organizational
17 chart, as it was at that time, in here and brought
18 to his attention, as I mentioned, after discussions
19 and the successes that we had accomplished in the
20 service department over those months, that I would
21 have received the salary increase as promised when
22 I was hired as the service manager.
23    Q. Okay.
24    A. So as I said, this had gone on for
25 several months.

Multi-Page™                          TERESA M. SCHULTZE
                                         June 29, 2005

Page 85

Q. After sending that e-mail, did you receive a raise?

A. Yes. As I mentioned, it was a small, nominal raise, but it was still not the 42,000 as had been promised.

Q. Do you have copies of your paychecks or pay stubs for 2003?

A. I don't know that I have all of them, but I do have the one that was supplied -- or, I believe it was supplied to us -- that reflects my last paycheck, and if you calculate that -- there was even an e-mail I believe we supplied that Roger sent to Bill Schneider, if I recall correctly, that reflected the raise from -- you know, the small incremental raise that was granted at that time in the May, June time frame.

I think -- let me go back. We discussed it in May. Nothing happened the month of May.

As I refer to here, according to my credit union statement that I reviewed last weekend, I see I have not received a salary adjustment for the last two pay periods.

So this had been a month past, and nothing had appeared.

MS. BOGART: And when you read that,

Page 86

you're looking at Roger Goodrich 6.

A. (Continuing) Yes, I'm referring to Exhibit 6, R. Goodrich 6, dated June 2nd, 2003.

Q. Okay. In that exhibit you included an organizational chart.

A. Yes.

Q. Where did you get that chart, or did you make that up yourself, or was that -- did you get that from someplace else or --

A. You know, I don't recall if I made it up or if -- I don't recall there being anything on the intranet or internet where I could have gotten it, so I can't say definitively. More than likely, I probably made it up.

Q. Okay.

A. But I can't tell you with a hundred percent certainty.

Q. I note on there there's a couple of employees, Rick Pobanz and Phil VanEarwage.

A. Phil VanEarwage.

Q. VanEarwage?

A. Yes.

Q. Okay. Who are those folks?

A. Rick is the truck driver for the dealership.

Page 87

And Phil VanEarwage is what could be termed as a boomerang employee. He was retired from his career and worked part-time for the dealership as a parts runner, odd jobs, trash, local runs, runs to town so we wouldn't have to take a technician off of the floor at the labor rate, whatever it was at the time, and send them to town. We had a part-time employee that could do that much more efficiently and cheaper.

Q. And these two employees, Rick and Phil, they worked directly for you?

A. They worked out of the service department.

Phil sort of helped all over the dealership, but when he came in, usually he would come in the service office, find out if we had any particular parts for him to pick up, where he needed to go, so he could sort of plan his route out for the day.

And as I mentioned, he was part-time.

Q. There's also a mention on there about a student, a co-op student.

A. Yes, there was a young gentleman that worked as a co-op student out of the local school, Derek -- I think his name was Derek -- that came in

Page 88

on days that school was not in session or after school and helped out on a part-time basis, also, with some general labor duties.

Q. And he also worked in the service department?

A. The majority of the time it was the service department.

He would help in sales moving stuff around on the floor, sort of a general labor position, also, wherever he was needed.

Q. In Goodrich Exhibit 6 you say, "It is not ethically a sound decision to compensate a manager less than the technicians that work for that manager."

How did you make that determination?

A. I had been told by my predecessor, Klint Rice, basically the salary range for a number of the positions.

As I mentioned earlier, Klint had mentioned to me that I hold out for the 42,000 initially in the hiring discussions, and according to the organizational start -- or, chart, I'm sorry, as it stood, I was making less than the shop foreman and other similarly situated managers in the dealership.

Page 89

Q. Okay. And you thought that was ethically unsound?

A. I felt it was ethically and professionally not a sound decision to compensate a manager less.

For instance, I would anticipate the owner or general manager to get paid more than somebody under his area of management responsibilities.

Q. You mentioned -- or, we discussed this morning the hours of work, and I think you said it was either 7 or 7:30 until 4:30 or 5 depending on -- during the weekdays, depending on how busy things were --

MS. BOGART: That also went beyond that, depending on how busy --

Q. (Continuing) -- and on Saturdays.

MS. BOGART: And beyond the 5:30 I think she said.

A. And beyond the established times. Those were the business hours basically.

Q. Okay. In the period of time that you worked there, were you there at 7 or 7:30 each day, and did you work until 4:30 or 5 each evening?

A. Yes, I did. As a matter of fact, in

Page 90

addition to that, there were evenings that I stayed late. There were Saturdays that I worked into the afternoon to make sure that the business of the service department did not fall behind.

Q. Did you keep any record or documentation of the hours you actually worked?

A. No, but I -- not a documented...

Q. Do you know of anybody else who kept any document that would reflect that?

A. Not that I'm aware of. I know I did run into several employees, like, on a Saturday afternoon after the business closed. I recall, I believe, Mike DeRew coming in after the business had closed.

There were a couple of nights when our driver was out making a long run out of state, or whatever, and I stayed until he was back in town, called him on the cell phone.

There were a couple of nights like during the week or like at the end of the month when monthly reports had to be ran where there were some work orders that I wanted to have completed, and I stayed to make sure those were done.

Q. Were there any days when you left before 4:30 in the afternoon?

Page 91

A. Yes.

Q. Okay. How often did that occur?

A. I believe that's annotated on my leave chart that was supplied as a document.

Q. So if you left early, that would be annotated on your leave chart?

A. Yes.

Q. Okay. I'm going to show you Roger Goodrich Exhibit 7.

Could you tell me which days are annotated on there that you left early?

A. It would appear June 3rd for four hours, June 30th for four hours -- those are whole days.

July 1st -- I can't really tell if it's four or four and a half. It's a little fuzzy.

Oh, and March 27th, I didn't leave early -- well, I don't remember if I left early or came in late that day. That was the week that I broke my knee.

And other than whole days, that appears to be the only ones that are partial days.

Q. So it's your statement that the absentee chart, Exhibit 7, accurately reflects the days that you were gone?

A. To the best of my knowledge, yes.

Page 92

Q. And there weren't any other days that didn't get annotated, as far as you know?

A. As far as I know, no.

Q. The days that you were off for four hours or four and a half hours that you've mentioned, were those days that you were taking your mother to the doctor?

A. It would have either been taking my mother to the doctor, or it would have been -- possibly been myself for -- after breaking my knee, for physical therapy or a doctor's appointment that couldn't be scheduled at a more convenient time.

And I can't tell you if it was leaving early. It may have been hypothetically coming in at ten, leaving at two and coming back, or it was just the number of hours I was gone during that day.

But it does not reflect that I came back after hours or later in the day and stayed late.

Q. But you would say that in the approximately six months plus ten days that you worked in 2003, worked at Goodrich in 2003, that there were only three or four days that you left early?

A. One, two, three, four --

Page 93

MS. BOGART: Objection to the form because these may indicate that -- these may reflect she came in late and/or left early.

A. (Continuing) Or left early. I can say those were days I worked a partial day during working hours, but there's nothing on here to reflect any extra time above and beyond the normal business hours of the dealership.

Q. Well, if you worked extra time on one day, would you come in late the next day?

A. No.

Q. Okay. Was there a situation where you were taking your mother to the doctor on a regular basis?

A. I would not say a regular basis.

My husband supported me a great deal by a lot of times taking my mother to her treatments in the morning, and I would pick her up -- since it was an all-day treatment basically, I would pick her up later -- late in the afternoon or early evening.

Q. But if you left early -- well, if you did leave early, who would you speak to? Would you tell somebody?

A. Yes. I always let somebody know, either

Page 94

Lori in the office, Roger -- I tried to keep him abreast.

Mike DeRew -- Mike filled in for me the majority of the time in my absence if there were calls that needed to be addressed to the service manager's attention.

I always had the cell phone with me. They all had my cell phone number.

If for any particular reason none of those people were available, I let somebody in the front office know, and that could have been whoever was in the office at that particular time.

Q. When you were at work, what areas of the building were you generally in? Your service office?

A. Depending on the situation, it could be any part of the dealership. It could be outside. It could be the showroom. It could be the sales office. It could be the shop. It could be any one of the individual parts of the shop, the CP area, the tractor shop, the combine shop, parts, the library, looking for tools in the tool room if something was not able to be located and was needed.

So it really depended on the situation.

Page 95

I mean, it's very diverse.

Q. Before your last day of employment, did you ever have any discussion with Roger Goodrich about your attendance?

A. As far as -- can you be more specific? I'm not sure what you --

Q. Well, about complaints that you had been gone.

A. No, he never mentioned to me that he had any complaints of me being gone.

There may have been one issue I recall on a short notice when a time had been changed and I received a call and left on one of these particular days that I told Mike DeRew.

It wasn't a day in advance or what I would consider advance notice.

Q. If you were going to be gone, though, you would tell somebody you were going to be gone like the day before or earlier in the day?

A. Or as soon as I knew for sure what the schedule was going to be based on my mother's test results or how she was doing at the time, yes.

Q. Would your mother's appointments normally be scheduled a few days in advance?

A. Sometimes treatments were scheduled and

Page 96

we tried to do that on a basis, as I mentioned earlier, that would allow my husband to take her in the morning and then sometimes she would have to wait for me to get done at work at night to pick her up.

Q. The point of my question was: Would you know when her appointments were a few days before the appointment, or would this be --

A. Sometimes.

Q. You say sometimes.

A. Yeah, sometimes. Like, I mentioned the one particular instance the doctor's office had a need to change it on very short notice which happened to be the same day, I believe.

Q. Let's talk about your last day of July 10, 2003.

Did you meet with Roger Goodrich on that day?

A. Yes.

Q. Okay. When did you meet with Mr. Goodrich?

And if there was more than one meeting, when was the first meeting?

A. I met with him in what I would consider a meeting. It was supposed to be at 9. I don't

Page 97

believe he showed up until about 9:07 that morning.

Q. Okay. And where was that?

A. Upstairs in what's referred to as the conference room.

Q. So at this meeting around 9 o'clock, what was discussed at that time?

A. Roger told me earlier that morning he wanted to have a meeting with me. He did not indicate at that time specifically what it was for.

At 9 o'clock I waited. He showed up about 9:07 and started the meeting by telling me that he felt I was taking advantage of him.

Q. Did he give any explanation of what he meant by that?

A. No, but that was the first question that I asked him.

Q. What was his response?

A. He felt that I had been taking advantage of him by taking off and not fully completing my responsibilities as service manager and that I had used up all of my vacation time.

Q. Okay. What further discussion did you have with him at that time?

A. I asked him what he was basing that on, and he said my time and attendance record, and I

Page 98

asked him to produce that, and he told me he did not have to give me jack shit.

Q. Okay. Was there any other discussion in that meeting?

A. Well, it was a short meeting. I did tell him I didn't appreciate him addressing me in that manner.

Q. Was there any discussion of your keeping track of the hours that you were there?

A. You mean as far as was I keeping a log of when I was there or when I was gone?

Q. Or that you should start punching in and punching out.

A. No, there was no mention made of that at that time.

Q. How -- what was the conclusion of this meeting?

You said he told you he felt you were taking advantage of him based on the time and attendance records.

You said you would like to see the records, and he says, I don't have to give you anything --

A. No. Actually, he said, I don't have to give you jack shit.

Page 99

1  Q. Okay. What did you take that to mean?
2  A. Well, I took it to mean that he wasn't
3 going to produce anything to substantiate his
4 reference --
5  Q. Okay.
6  A. -- or his allegation.
7  Q. And after he said that, he just left, or
8 did he say I want you to do something or not do
9 something or --
10  A. He said, Why don't you just resign.
11  Q. And what did you say?
12  A. I said I was not willing to do that. I
13 have no reason to resign. I enjoy my job.
14     And then I reiterated my request to see
15 the time and attendance that he had referred to,
16 and again he told me that he didn't have to give me
17 jack shit.
18  Q. Was that -- is that all you recall at
19 this time of the meeting that occurred about 9:07
20 on July 10?
21  A. No. I recall again asking him about the
22 promised pay raise that he had indicated when he
23 hired me because it had still not been resolved at
24 that point.
25  Q. And what did he say to that?

Page 100

1     So he's complaining that you're taking
2 advantage, and then you said, What about my pay
3 raise?
4     MS. BOGART: Objection.
5 Mischaracterizing the sequence that she has already
6 testified to.
7  A. Yeah, that's not exactly how it
8 transpired.
9     When he started the conversation and made
10 the comments, I asked for any evidence or a time
11 and attendance record to see so I could validate
12 what he may be referring to or object to what he
13 may be referring to.
14     As I mentioned, he said he didn't have to
15 give me jack shit.
16     I thought also this was an opportunity
17 for me to raise my question since I had him sitting
18 down in the same room.
19  Q. Okay. I'm just trying to get the
20 sequence here.
21     After he had suggested that you resign,
22 then you asked him about your pay?
23  A. Yes. It was still an ongoing issue.
24  Q. And what did he say to that?
25  A. Well, as I mentioned, he had told me he

Page 101

didn't have to give me jack shit, and it was at that point that he walked out and walked towards the break room next door where the technicians, and whatnot, were taking a break.

Q. So he left the meeting --
A. Yes, he --
Q. -- or left the room.
A. Yes, he left the meeting.
Q. What did you do?
A. I went downstairs to the front office and asked Bill Schneider for a copy of my time and attendance, and I also e-mailed Bill requesting a copy of the same.
Q. Did Bill Schneider give you that?
A. Yes, he did. He gave me a copy of the 2003 absentee calendar that you have marked Goodrich No. 7, I believe.
Q. What did you do next?
Did you show that to Roger or do something else?
A. No, I went back to my office where shortly thereafter I received an e-mail that Roger had put out to the entire dealership saying that he had accepted my resignation to which I replied that there must be some misunderstanding because I had

Page 102

not submitted my resignation.
Q. Okay. After your reply e-mail, what happened next with relation to your interaction with Roger that day?
A. Later in the morning or early afternoon -- it was at lunchtime -- Lori was in the office, and several of the technicians were standing around the time clock outside the office.
Jim Luikart came to my office bringing a time card and informed me that Roger wanted me to start punching in and out.
Q. Did he leave the time card with you?
A. Yes, he did.
Q. And did you have any further -- other than what you told us he said, did you say anything to him?
A. To Mr. Luikart?
Q. Yes.
A. Yes. I told Mr. Luikart that I did not report to him, he was not my manager and that if Roger wanted me to punch a time card, then he needed to discuss that with me, and that was an issue the two of us should resolve together.
Q. Did Roger come into your office after that?

Page 103

1  A. Yes. Mr. Luikart indicated that he would
2  relay that message, and shortly thereafter Roger
3  came back to the service office.
4     Q. What discussion, if any, did you have
5  with Roger when he came back to the service office?
6     A. He came into my service office and asked
7  for the time card, and at that time, I asked him
8  why I was being singled out to punch a time card
9  because, as a salary employee, none of the other
10 managers were ever required to do that.
11        Before I was able to finish that, in a
12 very loud voice he told me, Fuck you, and a few
13 more expletives and slammed the service door and
14 left, with Lori in the office and several of the
15 technicians by the time clock.
16    Q. Where was the time card at this point?
17    A. I believe it was on my desk.
18    Q. What did you do with the time card?
19    A. At that point, it was just on my desk.
20    Q. Did you throw the time card in the
21 wastebasket?
22    A. No, it -- it had been in the wastebasket
23 after Jim Luikart gave it to me. When Roger came,
24 I pulled it out and put it on my desk.
25    Q. So after Jim Luikart gave it to you, did

Page 104

1  you put it in the wastebasket?
2     A. Well, it wasn't a wastebasket. I had a
3  receptacle for recycling paper, I believe, right
4  under my desk. So it wasn't a wastebasket.
5     Q. It was a paper recycling container?
6     A. Yeah. We used old used paper for notes,
7  scratch paper, or whatever.
8     Q. Any further discussion with Roger at that
9  time?
10    A. Yes, he came back sometime thereafter and
11 in a sarcastic tone apologized for his rude
12 behavior and speech to me before that.
13    Q. Okay. Did you say anything further?
14    A. When he apologized?
15    Q. When he apologized.
16    A. No, I don't believe I really had an
17 opportunity because he was very short and left as
18 soon as he was done speaking.
19    Q. When Roger came in to talk with you about
20 the time card -- this would have been shortly after
21 Jim Luikart had left the time card in your office,
22 okay -- did you have a discussion with him in which
23 you told him that he would have to direct any
24 further communications with you to your attorney?
25    A. Yes. After he said the fuck you portion,

Page 105

I took offense to that and said, I would prefer you not address me like that, and from this point, if you're going to communicate in that manner, I would prefer you direct any communication through my legal representative or lawyer.

I don't remember the exact words.

Q. So it's your testimony that you made the comment about directing communication to your lawyer after he said fuck you, not the other way around; you said direct communications to my lawyer and then he said fuck you.

MS. BOGART: What? That's not what she said.

A. Say that again.

Q. I want to make sure I have your testimony correct as to the sequence. That he made the comment to you -- the fuck you comment to you, and then you said something about talking to your attorney.

Is that your testimony?

A. As I recall, that is the chain of events that took place.

It was in the same discussion, and I do believe that he said that first, and as I mentioned, I took offense to that.

Page 106

He seemed to say it in a very hostile nature, and at that point, I -- I had some reservations about continuing communication with him.

Q. At the point where -- okay. Now, Roger's come back and he's apologized to you.

At that point, what was your understanding or what did you think as far as your continued employment at Goodrich?

A. He sent an e-mail out after lunch that day which I believe was provided -- I can't tell you verbatim what it said -- that said something to the effect that if you would like to rescind, we'll change your position from exempt to nonexempt or something that reflects his intention to change me from salary to hourly.

Q. Did you ever have any discussion with him about that?

A. No. But when I received the e-mail, I had started a reply because I felt there were a number of issues that needed to be addressed.

Why all of a sudden, after pursuing the salary issue and a number of issues, was I as a manager being singled out to be converted from salary to hourly when that was not required of any

Page 107

of the other managers?

What was it going to be?

I had a number of questions regarding what's a normal workweek, what's the -- you know, what would the hourly rate be, what would the overtime rate be.

So there were a number of issues that I felt as a manager and him as the general manager we needed to address.

Q. You say you started a reply. I take it you didn't send the reply.

A. I never got a chance to. In the course of the afternoon in conducting the business -- at the end of the day when Roger came back to my office after 5 p.m., he turned off my computer.

Q. Now, I take it that there was a time card system at Goodrich.

Is that right?

MS. BOGART: Objection to form.

Q. (Continuing) Okay. Let me try again. Was there a time clock at Goodrich?

A. Yes.

Q. And did some employees punch time cards?

A. Yes.

Q. And did they punch in in the morning,

Page 108

punch out at lunch, punch back in after lunch and punch out at the end of the day?

A. Yes.

Q. Did this include some of the employees that you supervised?

A. Yes.

Q. Okay. Why did you think it was inappropriate for you to be asked to punch in and out?

A. Well, I felt that I was being singled out because I had brought up a number of issues, including my salary, including some training stemming back from some travel early in my employment with Goodrich, that I guess you could categorize as Roger and I not seeing eye to eye on.

Q. I mean, some of the shop foremen, for instance, punched in and out?

A. When you say shop foremen, are you talking Mike DeRew, Bob Roman?

Q. Right. Those two punch in and out, right?

A. Yes, I believe they did.

Q. And this was in supervisory positions?

A. They were shop foremen, so, yes, I guess you could consider them supervisory.

Page 109

They were responsible for their respective individuals in each of their shops.

Q. Well, we might as well finish out the day on July 10.

Did you have any communication with Roger Goodrich between the time when he came into your office and apologized and when he came back around 5 o'clock and turned off your computer?

A. No, I don't believe I did.

MS. BOGART: Other than what she testified to in the e-mail or something.

THE WITNESS: Right.

A. (Continuing) Are you talking physically seeing and --

Q. Yeah, I actually meant conversation.

I guess you did say that he sent an e-mail out --

A. Yes.

Q. -- to you and you had started to reply but didn't reply to his e-mail.

A. I started it but was not able to send it, correct.

Q. Okay. So then the next time that you saw or otherwise communicated with Roger after he had sent this e-mail was when -- was around 5 o'clock?

Page 110

A. A little after 5, yes, that same day.

Q. Was there some -- he came into your office, correct?

A. Yes.

MS. BOGART: When? When is this? At 5?

MR. PARK: Yeah, at 5 o'clock.

MS. BOGART: Okay.

A. (Continuing) A little after 5.

Q. A little after 5 o'clock Roger came into your office, correct?

A. Correct.

Q. All right. Did he say anything to you or just walk over and turn off the computer, or what happened?

A. No, he came towards the service office, opened the door. He had his cell phone to his ear and told me to get my fuckin' purse and get the fuck out.

Q. Did you make any response?

A. Well, I was shocked at first, and I asked him what he was talking about and why, and he referred to having his lawyer on the telephone and that I needed to comply or he would call the local law or law officials.

Page 111

1  I don't remember his exact verbiage.
2  Q. Did you overhear any part of his
3  conversation with his attorney?
4  A. Yes, he put his cell phone on speaker at
5  one point.
6  I asked him why I was being asked to
7  leave, and his lawyer, who -- he identified himself
8  as Dan Churchill, made reference to a resignation
9  and he said -- excuse me. Let me back up.
10  I said, I'm not leaving without my
11  personal belongings.
12  And the gentleman on the phone at that
13  time said that I was entitled to that, and so
14  Roger, you know, indicated I should get them.
15  And I asked why I was being -- or, being
16  asked to leave, and the gentleman on the phone who
17  identified himself as Dan Churchill indicated that
18  I had resigned and asked, Roger, you've got a
19  resignation, right?
20  And I clarified, No, he does not. I have
21  not resigned my position.
22  And there was silence after that.
23  Q. Was there any further discussion between
24  you and Roger at that time?
25  A. Yes. He indicated -- or, his youngest

Page 112

1 son Brandon was there, and he had Brandon get a box
2 for my stuff, and he stayed there in the office the
3 whole time.
4  I got my personal belongings and put them
5 in a box, and he had his son Brandon carry them
6 out, and he had Mr. Churchill on the phone the
7 entire time.
8  Q. Did you have any other discussion with
9 Mr. Churchill, or did you hear anything further
10 that Mr. Goodrich said to Mr. Churchill?
11  MS. BOGART: Objection to form.
12 It's compound.
13  A. Well, I can tell you that in the course
14 of gathering my personal belongings, I indicated
15 that I was missing a pair of glasses that I kept in
16 my desk as a spare pair and basically gathered all
17 of my stuff up, and as I said, his son carried it
18 out to my truck.
19  Q. Okay. So you mentioned that you're
20 missing your glasses.
21  Was there any other discussion that you
22 recall?
23  A. No. I looked quite extensively and asked
24 that if they were found, that they be forwarded to
25 me.

### Page 117

Ms. Bogart that day?
   THE WITNESS: Which cell phone?
   MR. CHURCHILL: Your personal cell phone.
   THE WITNESS: Yes, I believe so.
   MR. CHURCHILL: That's all. I just wanted to clarify that.
   MS. BOGART: She could have used the office phone, work related. It's allowed.
   MR. CHURCHILL: I didn't say it wasn't.
   Q. (Continuing) You mentioned that you sustained a personal injury in an accident.
   Was that in March?
   A. Yes.
   Q. Tell me about that.
   A. I broke my right bone behind the kneecap (sic).
   Q. And you were off work for several days after that injury?
   A. Yes. It happened on Sunday, and I was off -- Sunday the 23rd of March. I was off Monday, Tuesday, Wednesday all day and part of a day on Thursday.
   Q. When you returned to work, were you on

### Page 118

crutches or a wheelchair, or what was your situation?
   A. Painful.
   Q. I'm sure.
   A. I had crutches, but I also rented a wheelchair because I had to keep my leg straight.
   My orthopedic had advised me to stay off for several weeks, but Mr. Goodrich indicated that if I wanted a job, I needed to get my rear back to work, that they could not do without me.
   And so I came back on that Thursday and had a brace on my right leg that kept my knee stabilized and straight.
   Q. Okay. So it was sticking straight out?
   A. Yes, it was.
   Q. After that, did you go for some type of physical therapy for your injury?
   A. Yeah, it was sometime later. I was in the brace for -- oh, I think it was at least six to eight weeks, and I still kept the brace on after that, so nothing was done for several months, as far as therapy.
   Q. So while you were at Goodrich then, you wouldn't have had therapy?
   A. If I did, it would have been like in

### Page 119

 1  June, I believe.
 2     Like I said, I was in the brace for about
 3  six to eight weeks which would have been about the
 4  end of May, and it may have been the -- I don't
 5  remember the exact date that I started physical
 6  therapy. There was some in the recovery period.
 7     Q. Do you recall if you missed any work for
 8  physical therapy?
 9     A. There may have been like a partial day.
10  I tried to schedule it so it coincided at a time
11  that I could conduct the therapy and that didn't
12  interfere with the business.
13     I think the initial consultation with the
14  therapist required more time than the actual
15  therapy sessions, as I recall. I don't know those
16  dates offhand.
17     Q. Who was treating you for your injury?
18     Who was your orthopedic doctor?
19     A. Dr. Davis.
20     Q. And who was your physical therapist?
21     A. I don't remember the name.
22     Q. Was it Rock Valley?
23     A. Is that the one downstairs?
24     MR. CHURCHILL: Yes.
25     Q. (Indicating.)

### Page 120

 1     A. That's it then.
 2     MS. BOGART: When is a convenient
 3  time for a break?
 4     MR. PARK: Let's take five minutes.
 5     MS. BOGART: I'm not saying it is.
 6  When it is convenient for you, I need to make some
 7  calls here.
 8     MR. PARK: That's fine.
 9     (Break from 3:18 to 3:29 p.m.)
10     (Schultze Exhibit Nos. 5 and 6
11  marked for identification.)
12     MR. PARK: Okay. Let's get back on
13  the record.
14     Q. Calling your attention to July the 9th,
15  the day before your last day, on what is marked as
16  Roger Goodrich Exhibit 7, the 2003 absentee
17  calendar, there is a notation that says work
18  through and then an arrow.
19     Do you know what that means or...
20     A. Not specifically. I'm assuming that it
21  was just indicating that I worked through the 10th
22  and not on the 11th.
23     Q. Okay. All right. Do you recall the day
24  before you left Goodrich, in other words, July the
25  9th, 2003?