EXHIBIT

20

```
                                                    1
         IN THE UNITED STATES DISTRICT COURT
         FOR THE CENTRAL DISTRICT OF ILLINOIS
                  ROCK ISLAND DIVISION

TERESA M. SCHULTZE,        )
                           )
         Plaintiff,        )
                           )
    vs.                    )  NO.  03 CV 04089
                           )
GOODRICH EQUIPMENT COMPANY,)
                           )
         Defendant.        )


         THE DEPOSITION of ROGER D. GOODRICH,
called for examination pursuant to Rules 26 and
30(b)(6) of the Federal Rules of Civil Procedure
and the provisions of the United States District
Court for the Central District of Illinois and
Rules of the Illinois Supreme Court as they apply
to the taking of depositions, taken before Kathy
L. Johnson, C.S.R., a Notary Public in and for
the County of Henry, State of Illinois, on the
6th day of May, 2005, at the hour of 11:00 a.m.,
at the Rock Island County Building, 1504-3rd
Avenue, Rock Island, Illinois 61201.




              ADVANTAGE REPORTING SERVICES
```

```
                                                    2
                   A P P E A R A N C E S

     MS. SUSAN BOGART, ESQ.
     Law Offices of Susan Bogart
     30 North LaSalle Street
     29th Floor
     Chicago, Illinois 60602
     312/263-0900
         Appeared on behalf of the Plaintiff;

     MR. MARK CHURCHILL, ESQ.
     Churchill & Churchill, P.C.
     1610 Fifth Avenue
     Moline, Illinois 61265
     309/762-4690
         Appeared on behalf of the Defendant.

     MR. ROBERT T. PARK, ESQ.
     Snyder, Park & Nelson
     1600 Fourth Avenue
     Rock Island, Illinois 61201
     309/786-8497

     ALSO PRESENT:

     TERESA M. SCHULTZE

     WITNESS:   ROGER D. GOODRICH

     Examination by:                        Page:

     Ms. Bogart                               4
```

```
                                                    3
                      E X H I B I T S


         R. Goodrich No. 1                    23
         R. Goodrich No. 2                    72
         R. Goodrich No. 3                    84
         R. Goodrich No. 4                   105
         R. Goodrich No. 5                   107
         R. Goodrich No. 6                   109
         R. Goodrich No. 7                   111
         R. Goodrich No. 8                   165
         R. Goodrich No. 9                   166
         R. Goodrich No. 10                  170
         R. Goodrich No. 11                  204
         R. Goodrich No. 12                  207
         R. Goodrich No. 13                  211
         R. Goodrich No. 14                  216
         R. Goodrich No. 15                  217
         R. Goodrich No. 16                  219
         R. Goodrich No. 17                  222
         R. Goodrich No. 18                  224
         R. Goodrich No. 19                  225
         R. Goodrich No. 20                  227
         (Retained by Ms. Bogart)

         Signature reserved

         CERTIFICATE OF REPORTER          262-263
```

```
                                                    4
                          (Witness sworn.)


             ROGER D. GOODRICH,
being first duly sworn on oath, was examined
and testified as follows:
                 EXAMINATION BY
                  MS. BOGART:
Q. Okay.  Can you state your full name,
please, and spell your last name?
A. Roger Dale Goodrich, G-O-O-D-R-I-C-H.
Q. Okay.  And where do you reside?
A. 925 Goldfinch Court, Geneseo, Illinois,
61254.
Q. And how long have you been there?
A. 24 months.
Q. Oh.  And before that?
A. Number 50 White Pine Road, Geneseo,
Illinois, 61254.  10 years.
Q. Okay.  And how are you employed?
A. By Goodrich Equipment Company in Geneseo,
Illinois.
Q. And how long have you been at Goodrich
Equipment Company?
```

EXHIBIT 20

21

1   A. No. It was probably about 35.
2   Q. Okay.
3   A. I think. These numbers are approximate
4   but --
5   Q. In 2000?
6   A. The same.
7   Q. Tell me what the business of Goodrich
8   Equipment Company is.
9   A. We sell and service John Deere equipment
10  on the ag and Consumer Products side of the
11  equation, and we sell parts for the equipment
12  we sell.
13  Q. Okay. And in so far as the organizational
14  structure of John Deere is concerned, can you
15  tell me is it the same today as it was in the
16  2000-2001 time frame?
17  A. The organization as to how?
18           MR. PARK: I'm sorry. The
19  organization of John Deere or of Goodrich
20  Equipment Company?
21           MS. BOGART: Goodrich.
22           MR. PARK: You said John Deere.
23           MS. BOGART: Oh. I'm sorry.

22

1            MR. PARK: I'm not sure if --
2            MS. BOGART: If I, I really, I
3   apologize.
4            MR. PARK: -- he knows the entire
5   organizational structure.
6            MS. BOGART: Yeah. No.
7   Goodrich. I'm sorry. Goodrich Equipment.
8            THE WITNESS: It's predominantly
9   the same, yes.
10  BY MS. BOGART:
11  Q. Okay.
12  A. We have shifted some roles and
13  responsibilities as our businesses have
14  evolved, but the employees remain largely the
15  same.
16  Q. Okay.
17           MS. BOGART: So let me show you
18  what I'm going to mark, and what I would
19  propose to do, you can take, these are all from
20  what you've produced.
21           MR. CHURCHILL: Yeah.
22           MS. BOGART: And I'll send you
23  the marked versions after the deposition if

23

1   that's okay?
2            MR. CHURCHILL: Sure.
3            MS. BOGART: Okay.
4            (R. Goodrich Exhibit 1 marked for
5            identification.)
6   BY MS. BOGART:
7   Q. Let me show you what I've marked as R.
8   Goodrich One. Do you recognize that?
9   A. Yes.
10  Q. Okay. And what do you recognize it to be?
11  A. It was an organizational chart of people
12  that we have working for us.
13  Q. Okay. And first let's tell me, ignoring
14  the people who filled the positions, is that
15  the organizational chart of the company in the
16  year 2000 through 2001?
17  A. I told you that I was at John Deere for 24
18  months, 1999 through 24 months.
19  Q. 2001?
20  A. Okay. I don't think Teresa was with us in
21  2001. But prior to that it was Clint Rice in
22  2001.
23           MR. PARK: I think her question

24

1   was the organization.
2            MR. CHURCHILL: No. Other than
3   the people. Disregard the names she said.
4            MR. PARK: Disregard the names.
5   Is the organization essentially the same?
6            THE WITNESS: Yes.
7   BY MS. BOGART:
8   Q. Okay. So during the period of 2002 to
9   2003 that is an accurate depiction of the
10  organizational chart?
11  A. Yes.
12  Q. Both in terms of positions as well as
13  people?
14  A. Yes.
15  Q. Okay. Okay. Now, you say that there's a
16  date up in the upper, as you're facing it,
17  right hand corner. Do you know who put that
18  date there?
19  A. It appears to me that that might be the
20  handwork of Jim Luikart.
21  Q. Okay. And the date that appears there?
22  A. 6/16/2003.
23  Q. Okay. So what does that date represent?

25

1  A. The org chart of the people that currently
2  work for us.
3  Q. That worked as of that date?
4  A. I'm assuming so.
5  Q. Did you prepare that document?
6  A. No.
7  Q. Who prepared the document?
8  A. Bill Schneider.
9  Q. Okay. At whose direction?
10 A. Mine.
11 Q. What is it that prompted you to have an
12 organizational chart prepared?
13 A. We wanted to understand the roles and
14 responsibilities of each person within our
15 organization.
16 Q. Who is we?
17 A. My father and I.
18 Q. Okay. So you had a conversation with your
19 father that preceded the creation of that
20 organizational chart?
21 A. Yes.
22 Q. Okay. And who else was present?
23 A. Jim Luikart. That's it.

26

1  Q. So the three of you?
2  A. As I recall.
3  Q. Okay. And where did the meeting take
4  place?
5  A. Our conference room.
6  Q. At Goodrich?
7  A. Yes.
8  Q. And I guess I haven't gotten the address
9  of Goodrich. Could you give me that?
10 A. 939 Highway 6, Geneseo, Illinois.
11 Q. Okay. And has it been there throughout
12 the 2000 period?
13 A. Yes.
14 Q. All right. Now, tell me what was said
15 and by whom at the conference. Well, strike
16 that.
17          Do you remember approximately
18 when in relationship to the June 2003 date the
19 conference between yourself, your father and
20 Mr. Luikart occurred?
21 A. We just had an organizational chart that
22 we put with --
23 Q. No. No. Here's the question. In

27

1  relationship to that June '03 date on this
2  Exhibit. One month before? Two months before?
3          Do you remember approximately
4  when the meeting occurred?
5  A. No.
6  Q. Six months before?
7  A. Probably.
8  Q. Probably six months before the --
9  A. Within the six months.
10 Q. Okay. And can you say what was said and
11 by whom?
12 A. No.
13 Q. Can you tell me approximately what was
14 discussed that led to the creation of this
15 chart?
16 A. No.
17 Q. You can't remember any of the --
18 A. No.
19 Q. -- subject that was discussed?
20 A. No.
21 Q. Prior to the creation of the Exhibit One,
22 did you have an organizational chart?
23 A. I think we did.

28

1  Q. Okay. All right. So tell me what
2  directions you gave to Bill Schneider following
3  the meeting at which it was decided to do the
4  chart?
5  A. We wanted to understand the roles and
6  responsibilities of our employees, and so we
7  wanted to have them kind of laid out to
8  understand where they were at within our
9  organization.
10 Q. Okay. And tell me who Bill Schneider is,
11 or was.
12 A. Bill Schneider is our payroll
13 administrator and company policy coordinator.
14 Q. And was he in 2002 and 2003?
15 A. Yes.
16 Q. Is he the HR department?
17 A. You could say that.
18 Q. Anybody else that's HR?
19 A. Jim Luikart and I assist.
20 Q. Okay. So my next question was, who is Jim
21 Luikart?
22 A. Our controller.
23 Q. And how long has he been in that position?

# GOODRICH EQUIPMENT COMPANY

- **OWNER**: DALE GOODRICH
- **GENERAL MANAGER**: ROGER GOODRICH

## OFFICE MGT/ACCT DEPARTMENT
**MANAGER/COMPTROLLER**: JIM LUIKART
- CONNIE JOHNSON
- WILLIAM SCHNEIDER

## AG SALES DEPARTMENT
**MANAGER**: DENNIS DESPLINTER
- LEO CASTELEIN
- JAY MINNAERT

## C & CE SALES DEPARTMENT
**MANAGER**: RANDY LIPES
- KLINT RICE

## SERVICE DEPARTMENT
**MANAGER & SAFETY DIR.**: TERESA SCHULTZE
- LORI HAMER (CLERK)
- RICK POBANZ (TK DVR)
- PHIL VANEARWAGE (MAINT)
- CO-OP STUDENT

### SERVICE SHOPS

**TRACTOR SHOP** — FORMAN MIKE DEREW
- ANDY ANDERSON
- GREG DECKER
- ROBERT DESMITH
- DAVID RYAN

**MACHINES SHOP** — FORMAN BOB ROMAN
- DOUG CLARK
- SCOTT NELSON

**LAWN & GARDEN SHOP** — FORMAN TIM VANDERSNICK
- STEVE DEPAUW
- CHAD STACH

## CUSTOMER SERVICE REPRESENTATIVE
- STEVE CLEMENTZ

## PARTS DEPARTMENT
**MANAGER**: DON MCDONALD
- RICK BLAIR
- MARK CLEMENTZ
- CHRIS ROBINSON



**Page 57**

```
 1  he came on probably about two to three months
 2  afterwards.
 3  Q.  September?
 4  A.  August, September I believe.
 5  Q.  Where did he come from?
 6  A.  Where did he come from?
 7  Q.  Uh-huh.
 8  A.  I think he worked for a diesel, he was a
 9  service schedule manager for a diesel engine
10  service down here in the Quad Cities.  I, I
11  don't know the name of it now.
12  Q.  Did you hire him?
13  A.  Yes.
14  Q.  Okay.  And does he perform the safety
15  director position?
16  A.  Yes.
17  Q.  All right.  And how much is he paid?
18  A.  He started on, I can't remember.  Larry
19  started on at $35,000.
20  Q.  Okay.  Now, you're consulting something.
21  A.  It's just records.  These are employee
22  comparable salary records.
23  Q.  Okay.  And --
```

**Page 58**

```
 1  A.  I just have Larry, I have Larry, he
 2  started 8/15/2003.
 3  Q.  All right.  Is this what, you're
 4  consulting something that you ran off of a
 5  computer?
 6  A.  Jim Luikart ran it, yes.
 7  Q.  Okay.  I think what I'll do is identify it
 8  as an exhibit and just make it D. Goodrich Two.
 9  A.  Do you want to see it, Bob?
10  Q.  I mean R. Goodrich Two.
11          MR. PARK:  Are there, this is a
12  different document.
13          MS. BOGART:  Yeah.  And so I
14  don't think there are any extra copies but I
15  wonder if they have a copy machine around here.
16          MR. PARK:  Do you want to see if
17  we can get a couple copies of that?
18          MS. BOGART:  Sure.
19          (Discussion off the record.)
20  BY MS. BOGART:
21  Q.  While we wait for that, is that salary
22  comparable to what he was earning when he came?
23  A.  No.
```

**Page 59**

```
 1  Q.  Was it more?
 2  A.  It was less.
 3  Q.  Okay.  How much?
 4  A.  A lot less.  $25,000 less.
 5  Q.  And so why did he choose to do that?
 6  A.  He and his supervisor weren't compatible.
 7  Q.  And who was that.
 8  A.  I don't know.  Consolidated Diesel
 9  something down here in the Quad Cities.
10  Q.  How much is he making now?
11  A.  I think he's around 47.
12  Q.  Now, does he get a bonus?
13  A.  No.
14  Q.  No bonus?
15  A.  Huh-uh.  No.
16  Q.  Just a salary raise?
17  A.  He has received a salary raise.
18  Q.  Okay.  And how have you determined that?
19  A.  He has completely turned our service
20  department around.  The --
21  Q.  That wasn't my question, so I'll strike
22  that.  My question is, how do you determine the
23  salary raises that he received?
```

**Page 60**

```
 1  A.  Based on the performance of his
 2  department.
 3  Q.  As measured by what?
 4  A.  Again, if I don't have to go back to the
 5  service department and listen to 15 different
 6  people that have a problem with their
 7  day-to-day activity as an employee then I
 8  assume that he's doing a good job.
 9  Q.  What kind of a problem?
10  A.  If work, service work, is flowing smoothly
11  through the shop; employees are happy in their
12  work; customers seem to be happy to pay their
13  bill because they feel like it was done fast
14  and fairly, these are all things that we use to
15  gauge the performance of the service
16  department.
17  Q.  Okay.  So when you say the customer is
18  happy --
19  A.  Yes.
20  Q.  -- tell me what that means.
21  A.  If a customer comes up and said hey, I had
22  my tractor recently overhauled and I dealt with
23  Larry on the final bill and I feel like your
```

77

1   Q. At hourly rates, is that right?
2   A. Yes.
3   Q. Do either of them, looking at Goodrich
4   One, appear on the same line as Teresa
5   Schultze?
6   A. No.
7   Q. Okay. The designation of comparable
8   salaries, who picked that word?
9   A. I think it was a loose term that we used.
10  Comparable salaries meaning everybody in the
11  company that was on salary.
12  Q. Okay. Well, 18 dollars an hour is not a
13  salary, is it?
14  A. That's because he punches a time clock.
15  Q. Right.
16  A. Uh-huh.
17  Q. So it's not a salary, it's an hourly rate?
18  A. Right. Right. What happened was is in
19  2002 he was an hourly employee.
20  Q. Okay. And then he went to a salaried
21  employee in 2003?
22  A. That's what it indicates.
23  Q. I see. So because we're capturing 2002

78

1   and 2003 we might have a shift from an hourly
2   rate to a --
3   A. Yes.
4   Q. Okay. So who determines that Bob Roman
5   should become a salaried employee in 2003?
6   A. I did.
7   Q. And how did you make that determination?
8   A. At that time he got an increase in salary
9   and I asked him if maybe he wouldn't want a
10  more steady income at that time because he was
11  hourly before and one week he would work 47
12  hours and the next week he'd work 65.
13             And so Bob was getting a little
14  bit older in terms of age, and I said maybe
15  you'd like a more steady income.
16  Q. Okay. So we don't know how much he made
17  in 2002?
18  A. I know approximately. He was probably
19  approximately about 46, 47,000.
20  Q. Okay. And Kent Edsel who was also a
21  foreperson, he was 17 per hour and remained 17
22  per hour --
23  A. Yes.

79

1   Q. -- in 2002 and 2003?
2   A. Yes.
3   Q. So he was not offered the same opportunity
4   to become a salaried employee?
5   A. No.
6   Q. Who decided not to offer that?
7   A. I did.
8   Q. Okay. He, Kent Edsel, is not up at the
9   manager role, is he?
10  A. Kent Edsel was the C and CE shop foreman.
11  Q. But he's not on the manager level, is he?
12  Yes or no. Is he?
13  A. No.
14  Q. Okay. Does he appear on this chart?
15  A. No.
16  Q. Does the positions comparable to his
17  appear on this chart?
18  A. Yes.
19  Q. Who's that?
20  A. That would be Tim Vandersnick.
21  Q. Okay. Because he took his job?
22  A. Yes.
23  Q. All right. So that's the third level down

80

1   from the manager role; is that right?
2   A. Yes.
3   Q. Okay. Now, Mike DeRew was the tractor
4   shop foreperson?
5   A. Yes.
6   Q. Is that in the same department as Roman
7   and Edsel?
8   A. No.
9   Q. It's not in the service department?
10  A. It's in the service department but we
11  determined that it's tractor department,
12  combine department and then lawn and garden
13  department.
14  Q. Okay. So they're all in the service
15  department --
16  A. Yes.
17  Q. -- but they're separate places?
18  A. Yes.
19  Q. Okay. And he, it appears, is a salary
20  person in 2002 and 2003 on your Goodrich Two?
21  A. Yes.
22  Q. Okay. So who determined that he would be
23  salaried as a foreperson?

85

1  interrogatory number six, and then I got a
2  bunch of documents behind it.
3  What I would like you to do is
4  that may be, in fact, the policy manual from
5  June '03, all of it.
6  The first part of it is all in
7  the same type and then it seems to change
8  slightly, which I think is really just
9  pertaining maybe to drivers and drug and
10 alcohol.
11 I'm not sure if that's the new or
12 old policy. But if you could just pick out the
13 pages that are the current policy.
14 Or at least the policy June '03.
15 Not the current but June '03.  Okay?
16 A. Okay. It would appear this would be the
17 '03.
18 Q. Also?
19 A. Yes.
20 Q. It's just -- okay.
21 A. Yes.
22 Q. Okay. It looks to me like it's relating
23 to particular positions or something. But in

86

1  any event, the type is different. That is not
2  significant in terms of today.
3  Okay. So the entirety of what
4  I've handed you as a group exhibit is the June
5  '03 policy?
6  A. It appears so, yes.
7  Q. Okay. Who created the June '03 policies?
8  A. Bill Schneider.
9  Q. And why did he do that?
10 A. We felt like our old policy manual was
11 needing updated and so, it had not been updated
12 for quite a few years and there was some new
13 laws in regards to drug testing and various
14 things, and so I commissioned Bill Schneider to
15 update our policy manual.
16 Q. What did he do to do that, do you know?
17 A. He bought a program, I think he requested
18 it from someone that referenced it and said it
19 was a good software program.
20 Q. Okay. All right. So looking back then
21 at R. Goodrich Two -- well, strike that.
22 Looking at R. Goodrich Three, where would I
23 find the provision that 47.5 hours is the

87

1  full-time position?
2  A. I think you'd find it under a standard
3  workweek.
4  Q. Well, I'm happy to give this to you and
5  maybe you can --
6  A. Well, Bob's got it.
7  Q. Okay.
8  MR. PARK: I don't see it. I
9  know it's in here but it's like finding a
10 needle in a haystack sometimes when you're --
11 MS. BOGART: What are you looking
12 at?
13 MR. PARK: I'm looking at 502.
14 MR. CHURCHILL: Eight and a half.
15 Yep.
16 MR. PARK: Actually also 507.
17 THE WITNESS: There you go.
18 MS. BOGART: Which is overtime?
19 MR. CHURCHILL: Correct.
20 MR. PARK: Correct.
21 BY MS. BOGART:
22 Q. Okay. So 507 of the policy manual which
23 is Exhibit E, I'm sorry. Exhibit Three, says

88

1  that the regular full-time hourly employees'
2  weekly work schedule is 47 hours, right?
3  A. Yes.
4  Q. Okay. Now, it doesn't seem to, and this,
5  you know, talks, the 507 is really about
6  overtime; is that right?
7  A. Yes.
8  Q. And overtime is only paid to hourly
9  workers?
10 A. It says hourly but everybody knows that it
11 included everybody.
12 Q. Here, answer my question. Strike that.
13 Overtime is paid to hourly workers?
14 A. Yeah.
15 Q. Okay. And they are non exempt?
16 A. Yes.
17 Q. Okay. Whereas salary workers are exempt?
18 A. Yes.
19 Q. All right. And they are not paid
20 overtime?
21 A. Yes.
22 Q. And that's really one of the primary
23 differences between exempt and non exempt?