EXHIBIT 20(A)

93

```
 1   does.  And some of our administrative
 2   assistants, Lori and Connie and Bill.
 3   Q. Lori Hamer?
 4   A. Yes.
 5   Q. Connie?
 6   A. Connie Johnson.
 7   Q. And Bill?
 8   A. Bill Schneider.
 9   Q. He punches in and out?
10   A. Yes.
11   Q. He's an hourly rate employee?
12   A. I believe he is.
13   Q. Okay. All right.  So when it says
14   footnote one, they are part-time and it's 51,
15   50, that's actually a misnomer?
16   A. I didn't produce the document.  I don't
17   know what it means.
18   Q. All right.  But as you understand what
19   part-time versus full-time was 51, 50 is more
20   than --
21   A. Yes.
22   Q. -- full-time?  I mean, yeah.  Is
23   full-time, is that right?
```

94

```
 1   A. Yes.
 2   Q. Okay.  And, all right.  So then we have,
 3   I think it must be a paycheck, January 2nd,
 4   2003, based on what you've described, the
 5   letter, the number two appears as a footnote?
 6   A. Yes.
 7   Q. Okay.  And the symbol below says full-time
 8   salary at $35,000 per year.  Right?
 9   A. Yes.
10   Q. How is it that -- well, strike that.
11   What is it that Jim Luikart utilized to
12   determine that there was a full-time salary of
13   $35,000 per year as of that date?
14   A. I don't know.
15   Q. So you don't know what documents he
16   consulted?
17   A. No.
18   Q. And that salary runs through June 5th of
19   '03; is that right?
20   A. It appears so.
21   Q. And paycheck then next to June 5th, '03
22   the letter, the number three appears; is that
23   right?
```

95

```
 1   A. It appears that way.
 2   Q. And that says full-time salary increased
 3   to $42,000 per year?
 4   A. Yes.
 5   Q. All right.  And you don't know what
 6   documents Jim Luikart was reviewing?
 7   A. He was probably reviewing our payroll
 8   records.
 9   Q. No, listen to the question.  Do you know
10   what documents he was reviewing?
11   A. No.
12   Q. Okay.  But it's a possibility he was
13   looking at payroll records?
14   A. A possibility.
15   Q. And what are the, what are the name of
16   these records?
17   A. It's just our payroll records.
18   Q. Are they on computer?
19   A. Yes.
20   Q. And what are they called?
21   A. Employee payroll records.
22   Q. Okay.  And how far do they go back?
23   A. I don't know.
```

96

```
 1   Q. Okay.  And then you are, he shows a final
 2   paycheck of July 17th, '03, and in the four it
 3   says final pay, partial week, right?
 4   A. Yes.
 5   Q. Okay.  Was Bill Schneider -- no, I'm
 6   sorry.  This is Luikart.  Was he there in these
 7   years 2002 and 2003?
 8   A. Yes.
 9   Q. All right.  Now, these base pay under the
10   category called comparables, which we've
11   established does not includes both hourly as
12   well as salary people and managers and non
13   managers; is that right?
14   A. Yes.
15   Q. All right.  That doesn't include bonuses?
16   Base pay?
17   A. Apparently not.
18   Q. Okay.  All right.  Now, did you, did you
19   hire Teresa Schultze?
20   A. Yes.
21   Q. Okay.  And was anybody else involved in
22   that decision?
23   A. Clint Rice.
```

105

1  footnote was correct.
2  BY MS. BOGART:
3  Q. Okay. Let me show you what I'm going to
4  mark as R. Goodrich Four --
5           MR. CHURCHILL: Four.
6  BY MS. BOGART:
7  Q. -- and ask you if you recognize that
8  e-mail?
9           (R. Goodrich Exhibit 4 marked for
10               identification.)
11 A. It looks like something I wrote.
12 Q. Okay. And who did you send it to?
13 A. I sent it to Bill Schneider.
14 Q. Okay. And what does it say?
15 A. It said that we would be paying Teresa by
16 the hour and then if we hire her full-time we
17 offer her $35,000 base compensation.
18 Q. Does it say if?
19 A. Yes.
20 Q. If you hired her?
21 A. Yes.
22 Q. Okay. And so it was offered to start her
23 at $35,000?

106

1  A. That's what it appears.
2  Q. And that's the position that Clint Rice
3  was performing --
4  A. Yes.
5  Q. -- immediately before?
6  A. Yes.
7  Q. And he was making $42,354 in that
8  position?
9  A. I believe so.
10 Q. Is that right?
11 A. Yes.
12 Q. Okay. Now, Teresa was hired; isn't that
13 right?
14 A. Yes.
15 Q. Okay. And her compensation was at 35 --
16 A. Yes.
17 Q. -- thousand? Now, was there any
18 conversation with Teresa at the time that she
19 was hired, or shortly thereafter, that she
20 would be, her salary would be brought up
21 commensurate with Clint Rice's once a couple
22 months had elapsed?
23 A. No.

107

1  Q. All right. So you deny that you told her
2  after 60 days her salary would be bumped up to
3  Clint Rice's?
4  A. Yes.
5  Q. Now, the document, Goodrich Two, says that
6  Teresa Schultze was making $4,000 as of June
7  5th, '03?
8  A. Yes.
9  Q. Do you have any document which reflect the
10 change in her salary?
11 A. No.
12 Q. Okay. Let me show you Goodrich Five and
13 ask you if you recognize that e-mail?
14          (R. Goodrich Exhibit 5 marked for
15              identification.)
16 A. Yes.
17 Q. And why do you recognize it?
18 A. It looks like my e-mail did appear.
19 Q. It's your e-mail?
20 A. Yes.
21 Q. Who did you send it to?
22 A. Teresa.
23 Q. And that's dated in May '03?

108

1  A. Yes.
2  Q. May what?
3  A. May 6th.
4  Q. And that says her salary's being increased
5  from $35,000 to $37,000, doesn't it?
6  A. Yes. Yes.
7  Q. Okay. But that isn't shown on Goodrich
8  Two, is it?
9  A. No. That's why I don't know where he got
10 his figures.
11 Q. Okay. And May 3rd, '03, or 5/03, is one
12 month before June 5, '03 when Jim Luikart said
13 she was making $42,000, isn't it?
14 A. It appears to be, yes.
15 Q. Would that be unusual to raise an
16 employees' salary to $37,000 in May and then to
17 raise it to $42,000 in June?
18 A. Yes, it would be highly unusual.
19 Q. Okay. So does that lead you to believe
20 that the figures on R. Goodrich Two, at least
21 in so far as Teresa's salary in May and June of
22 '03, are inaccurate?
23 A. Yes.

109

1  Q. Okay. Now, let me show you Goodrich Six,
2  I think, dated June 6th, '03.
3           (R. Goodrich Exhibit 6 marked
4               for identification.)
5  A. Okay.
6  Q. Do you remember getting that from Teresa?
7  A. Yes.
8  Q. And did you, to the best of your knowledge
9  do you recall responding to it?
10 A. To the best of my knowledge, I don't
11 recall.
12 Q. All right. That's an e-mail dated June
13 2nd, '03, isn't it?
14 A. Okay. It appears to be an e-mail.
15 Q. Uh-huh.
16 A. It appears to be a Word document. Most
17 e-mails had her name at the top if she sent it
18 from me.
19         Our e-mails all had this
20 appearance on the top. So this looks to me
21 like it's a Word document.
22 Q. Okay. And you say this appearance, you're
23 pointing to Goodrich, what is that number?

110

1  Five?
2           MR. PARK: Five.
3           THE WITNESS: Yes.
4  BY MS. BOGART:
5  Q. Goodrich Five. And you're showing it
6  would have a name and then a line underneath
7  it?
8  A. Yes.
9  Q. Okay. Whereas Goodrich Six doesn't have
10 that format?
11 A. Right.
12 Q. It has some type and then it has an
13 organization chart?
14 A. Yes.
15 Q. Okay. All right. Now, that's June 2nd,
16 2003 and Teresa said that she has of yet not
17 received a pay raise, doesn't she?
18 A. That's what she says.
19 Q. Do you know when the pay raise to $37,000
20 took effect?
21 A. No.
22 Q. Do you know if you responded to that
23 e-mail? Or I mean that memo?

111

1  A. I do not know.
2  Q. And if I ask you why the pay raise hadn't
3  taken effect, did you know that?
4  A. No.
5  Q. Okay. Now, let me show you Goodrich Seven
6  and ask you if you recognize that document.
7           (R. Goodrich Exhibit 7 marked
8               for identification.)
9  A. It looks like an absentee calendar that
10 Bill Schneider would have kept on Teresa's
11 record.
12 Q. Is that what it's called?
13 A. It's called a 2003 absentee calendar.
14 Q. Okay. And it has more than just absences
15 on it, doesn't it?
16 A. It has some numbers on it. I don't know
17 what they reference.
18 Q. Does it have a series of places that says
19 training?
20 A. Yes, that's what it says.
21 Q. Okay. So it says training for what date?
22 A. The 24th through the 28th.
23 Q. Okay. And then how were these absences

112

1  reflected?
2  A. I can only assume that the absences would
3  be reflected by the numerical four, which I
4  would assume would mean that she worked a four
5  hour day.
6  Q. She worked that amount or she was off that
7  amount?
8  A. I don't know.
9  Q. One or the other?
10 A. Yes. It's not clear.
11 Q. Okay. Well, do you see some other entries
12 that might suggest to you that when there's a
13 number there it's showing how many, how much
14 time she was actually gone as opposed to how
15 much time she worked?
16 A. I don't know. Well, I'm the wrong person
17 to ask on that.
18 Q. Well, let me ask you this. Was Teresa one
19 of the people that punched a card?
20 A. No.
21 Q. Okay. And you don't see an hour marked at
22 all in the box, do you?
23 A. No.

### Page 113

1  Q. Okay. So --
2  A. No.
3  Q. If there's a 4.5 or an 8.5, would that
4  suggest to you that that's the time that she
5  took off?
6  A. Yes.
7  Q. Okay. Now, Bill Luikart -- no, Bill
8  Schneider maintained that record?
9  A. Yes.
10 Q. You recognize his handwriting under
11 training, for example?
12 A. No. I don't recognize Bill's handwriting,
13 but he's the one that kept this record.
14 Q. Okay. Did he keep it for everybody?
15 A. Yes.
16 Q. All right. Now, you recall at some point
17 Teresa had a medical issue with her knee?
18 A. Yes.
19 Q. Okay. What was that all about?
20 A. She had a biking accident and fell off a
21 bike or something and broke her knee. Or I
22 think it was broke.
23 Q. Okay. And so was she, did she have to

### Page 114

1  miss some time related to that?
2  A. Yes.
3  Q. Okay. And do you allow employees to miss
4  time related to medical incidents at Goodrich?
5  A. It is part of their vacation and personal
6  time leave of absence.
7  Q. Okay. So there is no medical?
8  A. No.
9  Q. Okay. So if somebody has a medical issue
10 they use up their vacation and their personal
11 time?
12 A. Yes.
13 Q. And so in the year it, let me see that for
14 a second. This is 2003. In the year 2003
15 what was the available personal days?
16 A. I don't know.
17 Q. Well, where would that be reflected?
18 A. It would be reflected in the policy manual
19 that Bill Schneider takes care of.
20 Q. Okay. The old one?
21 A. Yes. Whichever one we were under at the
22 current time.
23 Q. Okay. And the new one?

### Page 115

1  A. Yes.
2  Q. Well, are you under the impression that
3  you could lessen an employee's personal days in
4  the middle of a year?
5  A. I don't know anything about that. You'll
6  have to, you'll have to take that up with
7  somebody who knows in our organization.
8  Q. That would be?
9  A. Bill Schneider.
10 Q. Okay. So he's a personnel specialist?
11 A. Yes.
12 Q. All right. Did the number of personal
13 days change in the June policy manual?
14 A. I think in the June policy.
15 Q. 16th?
16 A. We might have increased them slightly.
17 Q. Okay. On, now how many vacation days?
18 A. I have no idea.
19 Q. Would those be spelled out?
20 A. Well, it looks like July 4th, for example,
21 is on there. So I would say yes.
22 Q. What do you mean it's on there?
23 A. It's on there, so it's designated as a

### Page 116

1  vacation day.
2  Q. Okay.
3  A. I don't know if that's something he can
4  put in there or not himself. I don't know.
5  Q. Okay. So did you accrue vacation time?
6  A. I don't know. I don't know anything about
7  vacation.
8  Q. So you don't have any idea about how much
9  vacation time employees received?
10 A. No.
11 Q. Neither before nor after the June --
12 A. No.
13 Q. -- 16th, 2003?
14 A. No.
15 Q. Okay. Now, was there a vacation? Was
16 there a policy relating to taking personal time
17 and vacation time before or after the June
18 16th, 2003?
19 A. To my recollection there was.
20 Q. And what was that?
21 A. I don't know.
22 Q. Well --
23 A. I'm aware that we had a policy but I don't

                                    117
1   know what it was.
2   Q. You don't know as you sit here?
3   A. Correct.
4   Q. You don't know what the policy today is?
5   A. Correct.
6   Q. Now, did you, do you have employees sign
7   documents that they have received policies?
8   A. Yes.
9   Q. Okay. So if Teresa received a policy
10  would, there would be a signed document saying
11  that she received it?
12  A. Yes, if she signed it.
13  Q. Well, if she didn't sign it wouldn't you
14  stick it in her personnel file anyway?
15  A. Yes.
16  Q. Okay. So if there's no documents, if
17  they're signed or unsigned, one conclusion
18  might be that she didn't get any policies to
19  look at?
20  A. She had them.
21  Q. No. Here's the question. One policy,
22  one conclusion might be if there's no document
23  in her personnel file showing the receipt of

                                    118
1   policies is that she didn't receive policies?
2   A. Yes.
3   Q. Who would hand her the policies?
4   A. Bill Schneider.
5   Q. That's before and after the change?
6   A. Yes.
7   Q. Okay. Now, did you have conversations
8   with Teresa when she, did she tell you that she
9   had broken her knee or had a knee injury?
10  A. Yes.
11  Q. And that she had to go to the doctor?
12  A. Yes.
13  Q. And did she tell you on other occasions
14  when she had to go to the doctor or to physical
15  therapy?
16  A. I'm not aware that she told me all the
17  time, no.
18  Q. You don't know?
19  A. No. I do know she didn't tell me every
20  time.
21  Q. Well, we have the times that she was --
22  A. This was the time. I don't think she was
23  real good about reporting to Bill.

                                    119
1   Q. Well, how would you know that?
2   A. We were very loose in our company with
3   that. We did not do a good job documenting
4   that, so if she walked out the door at 3:00 in
5   the afternoon he may not necessarily have known
6   it.
7   Q. Do you have a day on which that happened?
8   A. No.
9   Q. Do you have personal knowledge of her
10  walking out the door and not telling Bill
11  Schneider?
12  A. Not to my knowledge.
13  Q. Okay. So the fact that it's possible
14  there's no evidence that Teresa did it here?
15  A. Not on my behalf.
16  Q. Okay. But she did inform you when she
17  hurt her knee?
18  A. Yes.
19  Q. And you knew that she had physical
20  therapy?
21  A. Yes.
22  Q. Okay. She didn't conceal that from you?
23  A. No.

                                    120
1   Q. All right. And did you doubt that she
2   hurt her knee?
3   A. No.
4   Q. Okay. Did she come to work at one point
5   in a wheelchair?
6   A. Yes.
7   Q. Why was that?
8   A. She said she hurt her knee.
9   Q. Okay. Did you call her doctor to check on
10  her?
11  A. No.
12  Q. Did you know who her doctor was?
13  A. Nope.
14  Q. Did you ask her to give you the name of
15  the doctor and she refused?
16  A. No.
17  Q. Now, she also had a mother who had cancer,
18  right?
19  A. So she said.
20  Q. And do you doubt that?
21  A. Yes.
22  Q. Okay. So what steps have you taken to
23  determine if her mother did or didn't have

**121**

1  cancer?
2  A. None.
3  Q. All right. So what information, on what
4  basis do you doubt that her mother had cancer?
5  A. Her excessive absenteeism. I began to
6  wonder after a long time that there may be less
7  than truths to that.
8  Q. Okay. So tell me what's excessive on that
9  document?
10 A. This document doesn't indicate exactly
11 what's excessive. I do know that according to
12 shop personnel she was gone a lot.
13 Q. All right. We'll get to that.
14 A. Okay.
15 Q. On that document as to what is reflected
16 in terms of time that Teresa was gone, okay?
17 A. Yes.
18 Q. Is that excessive?
19 A. It doesn't appear to be.
20 Q. Okay. And certainly is training taken out
21 of vacation and personal days?
22 A. No.
23 Q. All right. So altogether, let me, we

**122**

1  have, we have March 24th, 25th, 26th and half
2  of the 27th that she's gone?
3  A. Yes.
4  Q. Okay. So that's four and a half days,
5  right?
6  A. Yes.
7  Q. Is that when she broke her knee?
8  A. I don't know.
9  Q. You don't recall?
10 A. No.
11 Q. Is it possible?
12 A. In March? Yes, it is possible.
13 Q. Okay. And then we have a half of a day,
14 June 3rd. So that's a total of five days. Is
15 that excessive?
16 A. For a six month employee it seems
17 excessive.
18 Q. When four and a half of the days are a
19 result of an injury?
20 A. It seems excessive, yes.
21 Q. Is it under the policy?
22 A. I don't know. I said I didn't know the
23 policy.

**123**

1  Q. Okay. So if it was within her vacation
2  days and her personal days is it excessive?
3  A. No.
4  Q. Okay. And then I believe we have two,
5  three other days when there's a half a day and
6  a whole day, two and a half days and a whole
7  day?
8  A. Yes.
9  Q. Okay. And you'd agree that if that's
10 within the personal days and vacation days that
11 are authorized that it wouldn't be excessive?
12 A. Yes.
13 Q. Now, did there ever, was there ever an
14 employee whose family or personal circumstances
15 were, the results resulted in them taking more
16 days than they had available?
17 A. Not to my recollection.
18 Q. You can't remember a single employee?
19 A. No.
20 Q. Okay. Now, is there family time? A
21 family medical leave policy?
22 A. Not to my knowledge.
23 Q. You're not aware of a family?

**124**

1  A. No.
2  Q. You know what the Family Medical Leave Act
3  is, don't you?
4  A. Yes.
5  Q. And what is your understanding of that?
6  A. Just if there's a crisis within the family
7  then they're allowed a reasonable amount of
8  time to take care of that crisis.
9  Q. Okay. And would you consider a cancer
10 illness to be that sort of a crisis?
11 A. Yes.
12 Q. Okay. Okay. Now, did you ever call
13 anybody to determine if Teresa's mother was
14 sick?
15 A. No, I told you that earlier.
16 Q. Okay. Did you ever ask anybody to check
17 on it?
18 A. No.
19 Q. Did you ever ask Teresa to produce
20 something that demonstrated --
21 A. No.
22 Q. Okay. Now, you know that you have a
23 family leave policy at least as in June 2003;

**125**

1  is that right?
2  A. Yes.
3  Q. And what did that provide?
4  A. I don't know. I just know it was in the
5  policy manual. Again, I did not write the
6  policy manual.
7  Q. All right. And, okay. What about
8  part-time employees? Were their policies
9  different than full-time?
10 A. I believe in the policy manual there were
11 provisions for part-time employees, yes.
12 Q. Okay. And how about family members of
13 yours? Do they fall under the policies of the
14 company?
15 A. My family members? No.
16 Q. Okay. So they weren't held to the rules
17 and regulations of part-time or full-time?
18 A. They were minor children, no.
19 Q. Now, as you sit here today do you have a
20 single piece of information that suggests that
21 Teresa's mother did not have cancer?
22 A. No.
23 Q. All right. When you say personnel, shop

**126**

1  personnel, which I gather is your sole
2  conclusion that she had excessive absences?
3  A. Yes.
4  Q. Or basis for your conclusion? Okay. Who?
5  A. Bob Roman. Well, all shop personnel
6  noted her coming and going.
7  Q. Okay. I'm asking about absenteeism.
8  A. Okay.
9  Q. Who reported that she was absent
10 excessively?
11 A. Bob Roman. Mike DeRew. Perhaps Tim
12 Vandersnick.
13 Q. Okay. What did Bob Roman say
14 specifically?
15 A. She's gone again.
16 Q. Okay. And on what occasion?
17 A. Numerous.
18 Q. Well, give me one date.
19 A. I don't have a date.
20 Q. Do you have a single document that
21 reflects that?
22 A. Not today, no. I'm not aware that we do,
23 no.

**127**

1  Q. Okay. So Bob Roman said she's gone again
2  how many times?
3  A. More than 10.
4  Q. Okay. What do you do?
5  A. What do I do? I try to reason with him
6  that she was -
7  Q. No, no, no. What did you do about his
8  accusation that she's gone again?
9  A. Nothing.
10 Q. Did you speak to Bill Schneider?
11 A. No.
12 Q. Never?
13 A. No. Not until late, when I discovered
14 that we had a really big problem. Then in
15 June I asked Bill Schneider about the checks
16 and past --
17 Q. When was the first time that Bob Roman
18 said she's gone again?
19 A. I don't know.
20 Q. And what did he base that statement on?
21 A. That she walked out the door and he went
22 to get some information and she was gone.
23 Q. Gone from where?

**128**

1  A. From her office.
2  Q. Okay. Did you ever verify that she was
3  gone from her office?
4  A. On occasion I would go back there and see
5  the light off, yes.
6  Q. Okay. When?
7  A. I don't have a specific date.
8  Q. Okay. Have you got a document?
9  A. No.
10 Q. All right. Did you ever call Teresa on
11 those dates --
12 A. No.
13 Q. -- to see where she was?
14 A. No.
15 Q. You didn't go to Bill Schneider and say
16 put it in the back?
17 A. No.
18 Q. Now, was there a little friction between
19 Teresa and Bob Roman?
20 A. No.
21 Q. You weren't aware of any?
22 A. No.
23 Q. Okay. You weren't aware of Teresa sort of

**Page 129**

```
 1  having to ride herd so to speak? You know what
 2  I mean by that?
 3  A. Ride herd. Yes.
 4  Q. On Bob Roman to get him to do his job.
 5  A. No.
 6  Q. And you're not aware of that?
 7  A. To do his job? Absolutely not.
 8  Q. Teresa never brought it to your attention?
 9  A. No.
10  Q. All right. Tell me what Mike, what did
11  you say? DeRew?
12  A. DeRew.
13  Q. Yeah. What did he say?
14  A. Mike DeRew was mostly affected because he
15  had to cover in the office when she was gone.
16  Q. Okay. But what did he say?
17  A. She's gone again.
18  Q. Same words?
19  Q. And on how many occasions did he say that?
20  A. Several.
21  Q. Three?
22  A. Oh, more than that. I would have to say
23  the same amount like Bob, 10.
```

**Page 130**

```
 1  Q. Okay. And when was the first such
 2  accusation?
 3  A. I don't know.
 4  Q. And when was the last one?
 5  A. I think it was probably prior to her
 6  departure for the last day.
 7  Q. On the last day that she worked?
 8  A. No. It was probably within a day or two
 9  of that.
10  Q. Okay. So that would have been like July
11  something?
12  A. Yes.
13  Q. Well, did these remarks begin in June '03?
14  A. Yes.
15  Q. And continued throughout the time period
16  that she worked there?
17  A. Yes.
18  Q. Okay. Ever follow-up on Mike DeRew and
19  make a note in the file?
20  A. No.
21  Q. Talk to Bill Schneider?
22  A. No.
23  Q. Bring it to Teresa's attention?
```

**Page 131**

```
 1  A. Yes. Several times we brought it to her
 2  attention that hey, her absenteeism was causing
 3  some problems in the shop.
 4  Q. Is that in writing?
 5  A. No. They were informal reviews.
 6  Q. Who's we?
 7  A. I spoke to Teresa.
 8  Q. But no you have no e-mail to this effect?
 9  A. No.
10  Q. Who was present?
11  A. Myself and Teresa.
12  Q. No witnesses?
13  A. No.
14  Q. Okay. Well, if it was causing such a
15  morale problem and it was so disconcerting can
16  you explain why you gave her a raise in May?
17  A. Because I needed someone to fill that role
18  so badly that I was caught between a rock and a
19  hard place. And what I was trying to do was
20  provide incentive to do a better job.
21  Q. I see. So you gave her a raise even
22  though you're concerned about her salary? Her
23  absenteeism?
```

**Page 132**

```
 1  A. Yes.
 2  Q. But you don't put that in any documents?
 3  A. No.
 4  Q. So explain to me how giving her a raise
 5  provides an incentive.
 6  A. We had employee reviews, three that I
 7  recall, and each time I said I need you to stop
 8  being absent so much.
 9      I also need you to start turning
10  this department around from a standpoint of
11  employee morale.
12      We have several problems but I
13  think you can do the job. And I guess the
14  bonus or incentive was given to show her that
15  hey, I still had some little faith in her. But
16  it was unfounded.
17  Q. Okay. So what you're telling me is that
18  the salary increase that she got to $37,000 was
19  a bonus?
20  A. No. It was a compensation adjustment.
21  Q. Okay. So it wasn't a bonus?
22  A. No.
23  Q. All right. Now, do you have those salary
```

                                                                    133
1  reviews or those performance reviews?
2  A. No, they were verbal.
3  Q. Oh. Nothing in writing?
4  A. No.
5  Q. You did send complimentary e-mails, did
6  you not?
7  A. A few. Again, this was another way of my
8  trying to praise her on the very few times she
9  did good.
10 Q. So are you telling me that there's only
11 like two or three times that she did 12?
12 A. Yes.
13 Q. Out of the entire time period that you
14 employed her?
15 A. Yes.
16 Q. Two or three days?
17 A. Two or three days what?
18 Q. That she did well.
19 A. Two or three tasks.
20 Q. Two to three tasks.
21 A. Yeah.
22 Q. What were those?
23 A. I don't remember. Maybe we had something

                                                                    134
1  that went well. We had an employee safety
2  meeting and I said boy, that was a good
3  meeting, thanks for coordinating it. Hoping
4  that these were the types of things that
5  basically would build a better employee.
6  Q. Okay. So what were all the tasks that
7  Teresa was to perform?
8  A. She was, her primary task was to make the
9  shop personnel flow their day better.
10 Q. Okay. Anything else?
11 A. She was to schedule service work.
12 Q. Anything else?
13 A. She was to run monthly reports.
14 Q. Of what?
15 A. Of the shops. A labor revenue stream.
16 Q. Anything else?
17 A. No.
18 Q. Safety?
19 A. She had, I believe, one safety meeting at
20 my request.
21 Q. No. I'm asking what her job duties were.
22 A. Was she in charge of safety? Is that
23 what you're asking me? Well, it says safety

                                                                    135
1  director.
2  A. I don't think she did that very well.
3  Q. No. No. That wasn't the question.
4  A. Okay.
5  Q. My, the question was what were the duties?
6  A. I think I got them all.
7  Q. For safety?
8  A. No, she was not a safety director.
9  Q. She had the title but she didn't have any
10 duties?
11 A. She didn't do it.
12 Q. Well, what were the duties?
13 A. The duties were to hold periodic safety
14 meetings and make sure that our shop was in
15 compliance with OSHA.
16 Q. Now, prior to Teresa performing the safety
17 director position who performed it?
18 A. Clint Rice.
19 Q. And that was his job too?
20 A. I don't think it was his job. It was a
21 role that he took on and assumed.
22 Q. So he did have the title?
23 A. Right.

                                                                    136
1  Q. All right. Now, were there ever any
2  goals set out for the service department?
3  A. Not that I'm aware.
4  Q. No goals?
5  A. Oh, there were. There were sales labor
6  goals, yes.
7  Q. Things they're supposed to meet?
8  A. Yes.
9  Q. Okay. And how often were these
10 generated?
11 A. Quarterly.
12 Q. Who put them together?
13 A. Jim and myself.
14 Q. Jim Luikart?
15 A. Yes.
16 Q. Okay, now, and this is what the service
17 department was supposed to meet, or the service
18 managers' --
19 A. Yes.
20 Q. -- goals were supposed to be?
21 A. Yes.
22 Q. Okay. So have we received those in terms
23 of the performance of the service department

# 2003 Absentee Calendar

**Absence Codes**
- A Absent
- V Vacation
- T Tardy
- H Holiday
- L Layoff
- P Partial Hrs. Worked
- LE Left Early

Red number denotes an *unexcused* absence.

Black number denotes an *excused* absence.

| No. | Reason | No. | Reason |
|---|---|---|---|
| 1 | Lack of Work | 10 | Unknown |
| 2 | Sick (Employee) | 11 | Death in family |
| 3 | Family sickness | 12 | Jury Duty/Court |
| 4 | Accident – Self or family – off site | 13 | Birthday |
| | | 14 | Military |
| 5 | Injury on Job | 15 | Weather |
| 6 | Personal | 16 | Medical Appt. |
| 7 | Discipline | 17 | Recognition |
| 8 | Leave of Absence | 18 | Floating Holiday |
| 9 | Transportation | 19 | |

Name: TERESA SCHULTZE
Dept: 40   Hire Date: SVC. MGR   Emp. #: 
Position: NOV 02
Address: _____

## JANUARY
- 1: New Year's Day

## FEBRUARY
- 17: Presidents' Day
- 24 T, 25 T, 26 T, 27 T, 28 T

## MARCH
- 24: 8.5, 25: 8.5, 26: 8.5, 27: 4.5, 30

## APRIL
- 17: Passover
- 18: Good Friday
- 20: Easter Sunday

## MAY
- 26: Memorial Day

## JUNE
- 3: 4.0
- 16: 8.5
- 21: 8.0
- 30: 4.0
- Total: 4.0

## JULY
- 1: 4.0
- 4: Independence Day
- 7, 8, 9, 10: WORK THRU

## AUGUST

## SEPTEMBER
- 1: Labor Day
- 27: Rosh Hashanah

## OCTOBER
- 6: Yom Kippur
- 13: Columbus Day (Observed)

## NOVEMBER

## DECEMBER

EXHIBIT R Goodrich 7